## VICKERS v. DURHAM.

(Filed June 10, 1903.)

1. NUISANCE—*Injunction—Sewage— Writ.*

   The discharge of sewage on the premises of a person is only a nuisance *prima facie,* and not *per se,* and whether an injunction should issue will depend upon the facts in the case.

2. NUISANCE—*Injunction.*

   In an action for an injunction to restrain the defendant from discharging sewage on the premises of the plaintiff, it is incumbent on the plaintiff to show that such action would result in a nuisance and in irreparable damage.

3. EVIDENCE—*Sufficiency of Evidence—Injunction—Nuisance.*

   The evidence in this case to restrain a city from discharging sewage on the premises of the plaintiff is not sufficient to show a probaability that a nuisance would result therefrom.

4. EMINENT DOMAIN—*Damages—Injunction.*

   The fact that the method prescribed for assessing the damage caused by taking land for the construction of a sewage plant was illegal is not ground for restraining the construction of the plant.

ACTION by J. H. Vickers against the City of Durham, heard by Judge *T. A. McNeill,* at September Term, 1902, of the Superior Court of Durham County. From a judgment dissolving a temporary injunction, the plaintiff appealed.

*T. M. Argo, W. P. Bynum, Jr.,* and *Boone & Biggs,* for the plaintiff.

*Jones Fuller,* for the defendant.

MONTGOMERY, J. Our former courts of equity, from a very early day, as will be seen from the reported cases, have exercised jurisdiction to prevent by injunction threatened evils of the nature of nuisance, when the injury, if done, could not be repaid in damages—the foundation of the interference of equity resting in the necessity of preventing irrepa-

VICKERS v. DURHAM.

rable mischief and multiplicity of suits; and under The Code still larger powers have been conferred, affording additional remedies for the protection of rights and the prevention of the committing or continuing of wrongs connected with the free use and enjoyment of property. Indeed, so common has it become to resort to the courts for such relief that injunction can not properly be longer called a high prerogative writ. Nevertheless, such jurisdiction ought to be carefully exercised and the party seeking relief by injunction should be required to show that the matter complained of is of more than trivial consequence and that he has a strong apparent right to relief. Little difficulty is experienced in administering rights under injunction proceedings where the matter in litigation is in existence and constitutes a nuisance *per se,* under that head being embraced offences against the public morals, the unlawful obstruction or use of the public highways, acts endangering the health or safety of human beings, the overhanging of another's land, for the reason that proof, other than the fact of their existence, is not necessary to establish the nuisance. It is not necessary to go into the ill effects of such nuisance. Relief is granted in such cases as matter of course, upon its being shown that the fact exists. *Bell v. Blount,* 11 N. C., 384; 15 Am. Dec., 526. So, where the threatened and apprehended mischief would be a nuisance *per se,* upon an apparent cause being shown, an injunction would issue. In all other cases a different rule prevails, and its application to the different phases of each particular case is often attended with trouble, and has given rise to many conflicts in the decisions of the different courts. In the case now before us, the apprehended mischief complained of is not a nuisance *per se.* In the complaint, used as an affidavit, the allegation is that the defendant intends to discharge and deposit the sewage of the city of Durham upon the plaintiff's premises near its residence and there leave it. That

threat, if carried out, would constitute a nuisance *prima facie,* but not a nuisance *per se.*    *Evans v. Railroad,* 96 N. C., 46; Wood on Nuisances, Sec. 569.    We are then in the present case required to examine the evidence with the view to see whether the judge who heard the matter was in error, as the plaintiff alleges, when he held that the restraining order should be dissolved.

The complainant must set forth and show that the acts which he seeks to restrain will be a nuisance, that the injury to him will be real and the damage irreparable, and that the apprehension is based on imminent danger. How, or to what degree of certainty must the complainant make out his case? That is the main question in this matter.    We think the rule has been laid down by this court and that is, that injunctions should be issued only in cases where, upon the evidence, there is a *probability* that the act complained of is, or will be, a nuisance if permitted to remain or be committed.    In *Raleigh v. Hunter,* 16 N. C., 12, the court, after an examination of the evidence, said:   "With us under all the circumstances of the case a probability is sufficient," and in *Lowe v. Commissioners,* 70 N. C., 532, where the injunctive relief was the main relief sought in the action:   "In such case where a reasonable doubt exists in the mind of the court, whether the equity of the complaint is sufficiently negatived by the answer, the court will not dissolve the injunction, but continue it to the hearing."    The plaintiff's counsel accepted the rule of the probability of resulting injury as the correct one in this case.

Upon a careful examination of the evidence, and fully alive to the importance of the matter involved, we have come to the conclusion that it is not probable that the plaintiff will be injured by the erection of the defendant's sewage plant, or that it will be a nuisance after it is erected and put in use. The answer of the defendant and the affidavits filed in addi-

tion thereto, leave no doubt upon our minds of sufficient importance to induce us to reverse the action of the judge.    The complaint of the plaintiff and the affidavit signed by twenty-four citizens of Durham County constituted the plaintiff's evidence in the case before the judge.    The substance of the complaint is that the defendant intended to extend its sewage system out of the city and to deposit the sewage upon the lands of the plaintiff near his house, and that if the act was done it would injure the health of his family and thereby cause him irreparable damage and injure the value of his property.    The defendants in their answer aver their purpose to discharge the sewage of the city of Durham, not on the lands of the plaintiff, but in a sewerage disposal plant, built with brick and cement, and, then, by most approved methods known to science, have it purified before its discharge into the streams.    The defendants further allege that the plant will not in any way endanger the health of the plaintiff or in any way interfere with or interrupt his comfort.    The defendants further answered as follows: "That after great diligence and inquiry as to his fitness, ability and skill, it employed J. L. Ludlow, an engineer of great experience in such matters, to make the plans by which its system of sewerage is being constructed, and to supervise the erection and building of the sewage disposal plant; that it is necessary, in order to prevent disease, preserve health and render the disposal of sewage harmless and inoffensive in every way, to purify the same in the manner above set out, and that owing to the topographical situation of the city of Durham it is necessary and most expedient to locate one of said plants at the place designated in the complaint and above referred to, and that by locating the same at that point the plaintiff will not be injured in health, nor will his comfort or happiness be in any wise disturbed; that the disposal plant aforesaid will be entirely harmless and inoffensive, and the defendant again

denies any and all allegations of injury to plaintiff, irreparable or otherwise." The affidavit of J. L. Ludlow, a sanitary and hydraulic engineer of experience and reputation, contains the following: "Owing to the absence of nearby running streams of sufficient size to satisfactorily dispose of the raw sewage from the city of Durham, I have incorporated in my plans disposal works for purifying the sewage before being turned into the streams. In determining the system to be adopted for this disposal and the preparation of plans for the same, I have not been restricted in any way by the city authorities of Durham, but have been given full license to adopt the best methods available.

"The plan comprehends a bacterial treatment of the sewage by a system known as septic tank and contact beds, which constitutes the best method of sewage purification known to the science of engineering and sanitation.

"Numerous experiments conducted in Europe and America during the last quarter of a century of the purification of sewage have demonstrated that the purification of sewage is accomplished by means of microscopic organic life, known as bacteria, and the bulk of experimentation and investigation have been directed toward determining the most favorable conditions and environments in which the bacteria can perform their life process. Nature provides bacteria in abundance in the raw sewage, but the conditions favorable to their operation must be artificially provided wherever a large quantity of sewage is accumulated and requires treatment.

"The most important demonstration by these investigations and experiments has been that bacterial action is performed by two different groups of bacteria, viz., the anaerobic and the aerobic, and that for proper and effective treatment of sewage, the conditions favorable to both groups of bacteria must be promoted. This has led to the development of the septic tank and contact bed system, which has been brought

to a point of rational and practical operation under controllable conditions and fixed regulations.

"In the septic tank and contact bed system, purification takes place in two or more stages. First, the raw sewage, from which the coarser materials may or may not be previously removed and strained, is passed into the septic tank, when the conditions favorable to biologic action by the anaerobic bacteria are promoted and the solid matter contained in the sewage is broken up into more simple compounds. The septic tank is just what the name implies, viz., a tank of dimensions suitable to the amount of sewage to be disposed of, where the sewage is confined for a time out of direct contact with light and air, which is the condition essential to the life processes of anaerobic bacteria, i. e., absence of oxygen. While it does not now appear that the anaerobic bacteria constitute the only agent at work in the septic tank, but that organic substances known as enzymes, and probably other forces, are assisting in the process known as hydrolosis, or the tearing down of organic compounds and rendering them in a fluid or semi-fluid state, however, it is amply demonstrated that such treatment of sewage does render it in a condition favorable to rapid, effective purification when exposed to the action of the aerobic bacteria by means of filtration in the contact beds.

"The filtration process may be pursued with a sand or other porous bed of sufficient area, but as the agency required are the aerobic bacteria, that is, the group requiring an abundance of oxygen for performing their life processes, the purpose should be to use the type of filter most conducive to the activity of this group of bacteria and their rapid multiplication. This is best accomplished by a form of filter known as contact beds, wherein the filter media is some form of medium sized material having the largest practicable amount of surface for adhesion of bacteria. Quite a large number of dif-

ferent materials have been experimented with and found sat-isfactory, viz., broken stone, coal, coke, gravel, furnace slag, top cinders, clinkers, burned clay, broken into lumps, etc.

"By this system of sewage purification, almost any degree of purification that may be desired can be obtained by prop-erly regulating the length of time which the sewage is ex-posed to the septic action in the septic tank and on the contact beds, and the number of contacts to which the sewage is ex-posed, and the purification of from 80 per cent to 90 per cent., which is the extraction of this percentage of all impurities existing in the sewage, is entirely practicable and of easy accomplishment. This is accomplished, too, with an entire absence of injury, or even offense, to persons living in the immediate vicinity of the works.

"This system of sewage purification is universally recog-nized by the engineering and sanitarians as the best and most complete method known to science, and has already been adopted and installed in a large number of American, English and Continental towns and cities, and is rapidly displacing all other systems of purification. The city of Manchester, Eng-land, with a population of more than half a million, estab-lished a large experimental plant for bacterial purification of sewage in 1895, and conducted experiments much more exhaustive than any other city in the world. In 1898, this city employed a commission composed of an engineer, a bi-ologist and a chemist, all of the highest rank in England, to report upon the various schemes of purification that had been suggested or tried up to that time, investing the com-mission with full authority and ample means for making any further experiments they might deem advisable. The result of this investigation and experimentation was the adoption of the septic tank and contact bed system for treating the sew-age, and to render it in a proper condition for discharging into running streams without violating the very stringent

requirements of the health authorities of the English government.

"The plans adopted for purification at Durham are shown in the blue print attached hereto. The sewage first goes into the chamber indicated as septic tank, where it is exposed to septic action, and is retained until the tank is filled. It is then pumped from the septic tank to what is designated as a dosing channel, from which it is fed by automatic apparatus to primary bed No. 1, until the bed is filled. The sewage remains in this contact bed for a sufficient length of time, viz., three or four hours, and is then discharged automatically by a time syphon to the secondary bed No. 1, where it is again exposed to the operation of the aerobic bacteria until the degree of purification that is desired is obtained, when it is discharged to the effluent pipe running in a nearby watercourse.

"During the operation of primary and secondary beds No. 1, the sewage is again accumulated in the septic tank until it is filled and septic action has taken place, whereupon it is applied to primary bed No. 2, thence to secondary bed No. 2, in the same manner as on primary and secondary beds No. 1. We thus have the contact beds working intermittently, allowing each bed in turn to have a renewed supply of air while not in operation, so that the conditions favorable to the constant multiplication in numbers of the aerobic bacteria are provided by means of working the two pairs of beds intermittently, and all conditions favorable to both the anaerobic and aerobic bacteria are thoroughly provided for, and the purification of the sewage is accomplished without any injury or harm to any person or any interests, and without any offense to the senses of smell or sight. Nature's process of purification of sewage and its transformation back into the original elements of which it is composed has been accomplished, and the effluent from the purification works which is turned into

running streams has been rendered in a non-putrefying condition, and is quite harmless and entirely inoffensive."

Affidavits of two other distinguished scientists were filed by the defendant, in which the plans and statements of the affiant Ludlow were approved and verified, except as to the lack of offensive odors at all stages of the purification of the sewage. The affidavit of Ludlow contains the statement that the purification of the sewage is accomplished with an entire absence of injury or even offense to persons living in the immediate vicinity of the works. The affidavits of the other affiants are silent on this point. The affidavit signed by twenty-four citizens and filed by the plaintiff is as follows: "We, the undersigned, make oath and say that the sewerage system as proposed and now attempted to be established by the city of Durham would be greatly injurious to the property and health of the people resident in the vicinity of the locality in which it is proposed to establish what they call a plant. It would corrupt and poison the air and water which we and our domestic animals must breathe and drink, and generate disease and produce death. We further swear that we live near and along the line of this fork, the wet weather stream upon which it is proposed to locate the dumping ground of the filth, slime, excrement and ordure of over one-half of Durham city, and have opportunities of knowing, and do know, whereof we speak. For some years this sewage has been emptied into Third Fork, which is dry most of the year, and has trickled down the bed of the stream and soaked into our lands, who reside along the stream, has filled the air with a nauseous and offensive and unhealthy stench, has produced disease, and in some families the death of its members. That we live along the line of such stream, some very near and others a mile or more therefrom, and speak from actual experience. That some of us live in the immediate vicinity of the proposed place of discharge and collection of the garbage,

filth and sewage, and know that the plaintiff, J. H. Vickers, as well as ourselves, would be irreparably injured and damaged in our property and health and comforts of home by the collection in any way of said sewage in or near the creek or vicinity aforesaid, and that it would be a dangerous and unbearable nuisance; and the defendant further swears that the line of drainage could be safely and conveniently extended down said creek and the sewage conveyed away into a flowing stream, without harm or inconvenience to the people, and that those of us through whose lands the drain pipes would run will give the right of way without charge.

"Wherefore, we protest, in defence of our property, our families and our lives, against the establishment of the proposed plant."

So it appears from everything in the case that the complaint of the plaintiff is based solely upon an apprehension of injury. None of the witnesses of the plaintiff professed to know anything concerning the plant for disinfection, or the methods of purification. The plaintiff is simply afraid that he may be injured by something of which he has no theoretical knowledge and with which he has had no practical experience. On the other hand the affidavits filed by the defendant are made by prominent and experienced scientists, and one of them has in several instances seen the practical results of the plan proposed by the city of Durham to dispose of its sewage. In *Dorsey v. Allen,* 85 N. C., 358; 39 Am. Rep., 704, this court said: "When the anticipated injury is contingent and possibly only, or the public benefit preponderates over the private inconvenience, the court will refrain from interfering." We think that still the correct rule, though there may be and are some expressions to the contrary in *Marshal v. Commissioners,* 89 N. C., 103. In addition to what we have said above, the great importance to the city of Durham of the public work which it is trying to carry out,

would make us hesitate before we would interfere by injunction.

In the complaint of the plaintiff there is an allegation that the method of condemning the plaintiff's land by section 31, Private Laws 1899, is unconstitutional and void, and it is argued by the plaintiff's counsel here that the injunction should have been continued to the hearing on that account. We cannot see how an unconstitutional act of the General Assembly can be made a ground of equitable jurisdiction. In the case before us it is not questioned that power is conferred by the Act upon the authorities of the city of Durham to take real estate for the purpose of establishing the sewage plant. The objection is that the method of assessing the value of the property condemned is illegal and unconstitutional. If that question was properly before us we would concur in that view. He can have his damages assessed in an action at law for that purpose or the defendant can proceed to have damages assessed under Chapter 49 of The Code. We have no case in our Reports in which this question is decided, but we have several in which the principal is decided— cases in which injunction against alleged invalid city ordinances were refused. *Wardens v. Washington,* 109 N. C., 22; *Scott v. Smith,* 121 N. C., 94; *Cohen v. Commissioners,* 77 N. C., 2. The ground on which such relief is refused is that "a court of equity will never interpose its jurisdiction in the way of a mere protective relief, when the party has an adequate and effectual remedy at law, and is so circumstanced as to be able to assert it, but would rather leave him to seek his redress in that forum, except in some states where they have statutes expressly permitting it to be done." *Busbee v. Lewis,* 85 N. C., 332.

There is

No Error.

DOUGLAS, J., concurring in result only:—I concur in the

judgment of the court on the understanding that its opinion means that the condemnation proceedings, so far taken, are unconstitutional and therefore void, and that the plaintiff will have the right to maintain his action in the nature of trespass for- damages for any such unlawful entry upon his property.