DURHAM v. COTTON MILLS.

(Filed May 28, 1906).

*Water and Water Courses—Rights of Riparian Owners—Reasonable Use—Pollution—Nuisance—Injunction—Protection of Public Drinking Supply—Statutes—Constitutional Law—Due Process—Police Power—Public Health.*

1.  A riparian owner has the right· to have the stream flow by or through the land in its ordinary purity and quantity without any unnecessary or unreasonable diminution or pollution by the owners above.

2.  The several proprietors along the course of a stream have no property in the flowing water itself, which is indivisible and not the subject of riparian ownership, but each one may use it as it comes to his land for any purpose to which it can be applied beneficially without material injury to the just rights of others.

3.  Whether the upper riparian proprietor is engaged in a reasonable exercise of his right to use the stream is a question for the jury, under the proper guidance of the court.

4.  Injunction is a proper remedy to prevent the fouling of the water of a running stream by its improper and unreasonable use when prejudicial to the rights of others interested in having the water descend to them in its ordinary natural state of purity.

5.  When the interposition by injunction is sought to restrain that which it is apprehended will create a nuisance, the proof must show that the apprehension of material and irreparable injury is well grounded upon a state of facts from which it appears that the danger is real and immediate.

6.  In an action by a city to enjoin defendant from emptying sewage and waste material into a river 17 miles above the city's intake, the opinion of several physicians and laymen that the pollution at the outlet of defendant's sewer will injuriously affect the water at the intake and endanger the health of the citizens who use the water, without an analysis of the water at the point of intake, is insufficient, under the facts and circumstances of this case, to authorize injunctive relief, especially where defendant's proof shows that there are many obstructions to the passage of deleterious matter and many natural means of purification between the site of defendant's mill and the intake.

7.  Revisal, section 3051 (Acts 1903, chapter 159, section 13,) prohibiting the discharge of sewage into any stream from which a public drinking supply is taken, is not confined to the water shed of 15 miles above the intake as defined in sections 2 and 3 of said act (Revisal, sections 3045-6), but extends beyond 15 miles from the intake of any stream from which water is taken to be supplied to the public for drinking purposes.

8.  Revisal, section 3051 (Acts 1903, chapter 159, section 13), prohibiting the discharge of sewage into any stream from which a public drinking supply is taken without reference to the distance of such discharge from the point of intake, is not unconstitutional as a taking of property without condemnation and without compensation, but is a valid exercise of the police power of the State to secure the public health.

ACTION by the City of Durham and T. A. Mann against Eno Cotton Mills, pending in the Superior Court of DURHAM, and heard by *Judge G. S. Ferguson,* at Chambers in Durham, on February 10, 1906, upon a motion for an injunction to the final hearing.

The action was brought for the purpose of enjoining the defendants from emptying its sewage into the waters of the Eno River, from which stream the plaintiffs allege the water supply of the city of Durham is obtained partly in the summer months. The material part of the complaint is as follows:

That the defendant owns and operates a cotton factory located about three hundred feet from Eno River, at the town of Hillsboro, in Orange County, North Carolina, and employs in and about its factory about three hundred operatives.

That said defendant maintains water closets in its said factory for the use of its said operatives and the deposits of human excrement therein are flowed and discharged through an eight-inch terra cotta sewer pipe directly into the Eno River, at a point about three hundred feet from said factory; that at times said sewer pipe becomes choked and

stopped up, and then said deposits or excrement and sewage are run through an open ditch and a small drain into said Eno River at about the point of discharge of said sewer pipe above mentioned; that it also maintains in connection with its said closets and system of sewage a manhole or brick chamber, which is just outside of its said factory, which manhole or brick chamber frequently overflows on account of the choked condition of the discharge pipe, and the overflow therefrom is deposited on the ground at and around the manhole, and is washed into the Eno River.

That the defendant also discharges large quantities of dye waste on the ground just outside of its factory, which flows and empties into the river, near the point where defendant's sewer pipe empties.

That said defendant owns about sixty dwelling houses, located on both sides of said Eno River, and on its water shed, which are occupied by the operatives in defendant's factory and maintains in connection with said dwelling houses a large number of open privies without a tub system, some of which said privies are within one hundred feet of the Eno River, and that the fæcal matter from said privies is washed by the rains into the Eno River.

That the said city of Durham and its inhabitants are now and have been for the past seventeen or eighteen years supplied with drinking water from a plant which is located on the Eno River at a point a few miles below defendant's said factory; and that the public drinking water supply of Durham and its inhabitants is taken from the Eno River at said plant.

That the city of Durham has demanded of the said defendant that it provide some other method of disposing of its sewage and dye waste, and other dangerous and foul matter, and that it discontinue to empty and discharge the same into the said Eno River, all of which said defendant has refused and still refuses to do, but on the contrary, wil-

DURHAM *v.* COTTON MILLS.

fully, negligently, unlawfully and in disregard of the comfort, safety and health of the inhabitants of the city of Durham and of the plaintiff, T. A. Mann, is flowing and discharging its raw sewage into the Eno River, from which the public drinking water supply of the city of Durham is taken, without having said sewage passed through some well known system of sewage purification approved by the State Board of Health or any other system of purification, and has avowed its purpose to continue to do so.

That as plaintiffs are informed and believe, the waters of the Eno River have become and are now being polluted and made unfit for drinking purposes, and that the health of the inhabitants of the city of Durham and of the plaintiff, T. A. Mann, are seriously menaced because of the acts of the defendant complained of above.

The prayer is for a perpetual injunction. His Honor granted a restraining order with an order to show cause why an injunction to the hearing should not be issued.

The plaintiff in support of the allegations of its complaint filed several affidavits of physicians to the effect that the sewage, dye waste and other deleterious matter, which are discharged into the river from the defendant's premises at Hillsboro, not only pollute the stream at that place, but will, in the opinion of the witnesses, pollute it at the place of intake near Durham where the plant of the water works company is located. Affidavits were also filed which tended to show that large quantities of feculent matter and dye waste are daily discharged into the river from the defendant's premises. It is not necessary to set forth the statements of these affidavits more fully, as they are quite sufficient to show that the water of the Eno River at Hillsboro is polluted by the acts of the defendant, and that one of the principal sources of such pollution is the daily deposit in the river of the contents of the defendant's sewer, and this is not only not denied by the defendant, but expressly admitted. One phy-

sician, whose affidavit was read by the plaintiff, expressed the opinion that the conditions at defendant's mill had much to do with the presence of typhoid fever in Durham and with the impurities found in the water supply of the said city and that, if there should be typhoid fever among the defendant's mill operatives, it is more than probable that it would be communicated to the inhabitants of Durham through the water and cause a serious epidemic, if present conditions are allowed to be continued. No evidence was offered by plaintiff tending to show that an analysis of any kind had been made of the water at the point of the intake near Durham to ascertain if there had been in fact any pollution of the stream at that place.

The defendant, while admitting the pollution of the river at its mill site, near Hillsboro, denies that it extends to the water at the intake of the water company, near Durham. In support of its denial it offers proof of the following facts: The volume of sewage conveyed into the river is very small compared with the volume of water into which it flows. The sewage pipe is only eight inches in diameter and empties eighteen miles above the water company's intake. The excreta are carried through the pipe, by the flushing of the closets with fresh water, to the river two hundred yards distant, and by the time of arrival at the outlet of the sewer the solid matter is practically ·dissolved. The sewage then passes immediately into the "upper reaches of a pond," which extends one and a half miles below the mill, and there are two other ponds below and four backwaters of former ponds with their dams now broken. There is necessarily sedimentation, which is a means of precipitation recognized by all the authorities upon the subject. In the stretch between the defendant's discharge pipe and the intake of the water company are numerous spring branches, creeks and brooks of fresh and pure water, flowing into the Eno River millions of gallons every twenty-four hours. Thus dilution

takes. place, another recognized means of precipitation. That the flow of sewage is not only small, as already alleged, but is never constant. The dyestuffs are discharged into an open drain at said mills after their coloring matter has been as much as possible removed, and little of the dye makes its way to the river, and not enough to discolor the water, and that none of it, as defendant is informed, would be injurious to health. That a flowing stream constantly renews from its sources and the accessions from other water courses and the interruptions of the current of this river by ponds and backwaters as described, would give the water polluted at the mouth of the sewer and drain ample time, considering the distance to be traversed, to become chemically and bacteriologically pure before it reaches the intake. The defendant also alleges that while the water company's plant was located on the Eno River before its mill was built near Hillsboro, yet that water was not taken from the stream for the purpose of supplying the city of Durham until three or four years after the defendant began to discharge sewage into the river and otherwise to use its premises as stated in the complaint. It further avers that the plaintiff could have an abundant supply of pure water from Nancy Rhodes Branch, if the water company had not carelessly and negligently permitted its pond, which is supplied by that branch, to fill, so that the volume of water it could have held was greatly diminished, and that the water company or the city of Durham can easily obtain a sufficient supply of pure water from two or more creeks conveniently located. That a plant for purifying sewage could be erected at defendant's mill only at great expense and would add nothing to the purity of the water at the intake of the water company, while the water company could at little expense rid the water of any impurities which it might gather as it flows and carry along with it to the intake. It is further averred that the water company has not a sufficient settling reservoir at its plant.

There are other matters stated in the affidavits of the respective parties, but it is not necessary that they should be set forth. The presiding judge made the following finding of facts and the following order thereon:

This cause coming on to be heard by consent in the city of Durham, on the 10th day of February, 1905, and being heard upon the affidavits filed, after argument of counsel, it appears to me from said affidavits filed in the cause:

That the Durham Water Company, a corporaton, supplies water to the city of Durham, for the use of its citizens for drinking and other purposes. That the water with which said city of Durham is supplied, for a considerable portion of the year, is taken from the Nancy Rhodes Branch, a tributary of Eno River, but that when the waters become low, during the summer and other seasons, when there is not much rain, the Nancy Rhodes Branch does not afford a sufficient supply for the needs of the city of Durham and its inhabitants, and on such occasions and for such times the water has been taken from Eno River and conveyed through pipes to the city and used by the inhabitants for drinking and other purposes.

Eno River is a stream some seven miles from the city of Durham; has its source in Orange County, and flows by the town of Hillsboro and the mill settlement of the defendant, the Eno Cotton Mills, which are situated near the town of Hillsboro and close to, some three hundred yards from the river, and about seventeen miles above the intake of water for the plaintiff and the city of Durham.

The defendant, the Eno Cotton Mills, is a corporation and has a large plant near the Eno River, as above set out, in which it employs three hundred or more operatives, and has dwellings on or near the banks of said Eno River for the occupancy of its operatives and their families. That in said mill are closets, for the use of its operatives; that the discharge from said closets is conveyed, in its raw state, through

terra cotta pipes and open drains, into Eno Rver, and the refuse of dye stuffs from the said mill is emptied out on the ground and flows and is washed into the river; that the operatives at their dwellings use privies, from which once a week the excrement is hauled off and buried. That the discharge from said mills and the dwellings of said operatives flow into Eno River and pollute and render unwholesome the water of the river at the place of discharge of said sewage, and for some distance below said mill.

It further appears, from said affidavits filed, that the pollution of the water of said river, by reason of the discharge from said mills, continues to such an extent down to the intake of the water supply for the city of Durham as to render the water less wholesome and in case of an epidemic at said mill, such as typhoid fever, would be dangerous to the health of the citizens of Durham using water from said river for drinking purposes.

The defendant has used no precautions to prevent polluting the water of Eno River and does not proposed to do so. The Durham Water Company established its plant on Eno River, seven miles from the city, before the defendant constructed its mills or built its plant, but did not use the water of the river for its supply of water to the citizens of Durham until after the defendant built its plant, and had its mill in operation with the same system of sewage and the same method for the disposal of its dyestuff and the human excrement as now used—with like pollution of the stream.

It further appears from said affidavits that the water now being used by the citizens of Durham is supplied from Nancy Rhodes Branch, and that the flow of said branch in all probability will be sufficient to supply the inhabitants of the city of Durham until the summer months, and that said water is pure, but that when the dry weather comes, and the streams become low, the flow of Nancy Rhodes Branch will not be sufficient to supply the city with water, and then the water

for such supply will necessarily in part have to be taken from the Eno River.

It is therefore considered, ordered and adjudged, that the restraining order heretofore issued be suspended in its operation until the 20th day of April, 1906, in order that the defendant, in the meantime, may provide some well known system of sewage purification, to be approved by the State Board of Health.

That from and after the 20th day of April, 1906, the defendant, its agents, servants and employees, under its control, is and shall be restrained from flowing or discharging any sewage into said Eno River until the same shall have passed through some well known system of sewage purification approved by the State Board of Health and from depositing human excrement and dyestuff, on the watershed of the Eno River at Hillsboro, so near to said river that the same shall flow or be washed into said river, until the final hearing of this action. From this order the defendant appealed.

*Fuller & Fuller* and *R. B. Boone* for the plaintiff.
*S. M. Gattis, J. W. Graham* and *Frank Nash* for the defendant.

WALKER, J., after stating the case: This is an application for an injunction to restrain the defendant from polluting the Eno River, which, it appears, is in part the source of supply to the city of Durham of water for drinking and other purposes requiring it to be kept free from impurities. The plaintiffs, although they have stated but one cause of action, base their right to relief upon two grounds: 1. That as the water supply of Durham is obtained partly from the Eno River at a place on that stream where the water company's plant is located, it has the rights in the water of the river of a riparian proprietor. 2. That if this is not so, it has the

DURHAM *v.* COTTON MILLS.

right to have the defendant enjoined from polluting the waters of the river under the recent act of the General Assembly (Revisal, section 3051), which reads as follows: "No person or municipality shall flow or discharge sewage into any drain, brook, creek or river from which a public drinking water supply is taken, unless the same shall have been passed through some well known system of sewage purification approved by the State Board of Health; and the continual flow and discharge of such sewage may be enjoined upon application of any person." This enactment in connection with the fact alleged that the city of Durham actually draws its water supply at a certain season of the year from the Eno River is claimed to confer upon it the right to enjoin any act of the defendant in violation of the statute which tends to contaminate the water of the river at the outlet of its sewer near Hillsboro, where its cotton factory is situated. We will consider these questions in their order.

It is well settled by the authorities that at common law a riparian owner has the right to have the natural stream of water flow by or through his land in its ordinary, natural state, both as to its quantity and quality, as incident to the ownership of the land by or through which the water course runs, and that right continues, unless it has been lost or in some degree abridged by adverse user or by grant. This, it must be understood, is not an absolute and unlimited right, but the principle as thus stated should be qualified so as not to interfere with the equal rights of other upper and lower proprietors on the same stream. The riparian right, therefore, expressed with greater accuracy, is to have the stream to flow by or through the land in its ordinary purity and quantity, without any unnecessary or unreasonable dimunition or pollution of the stream by the owners above. The several proprietors along the course of the stream have no property in the flowing water itself, which is indivisible and not the subject of riparian ownership, but each one may use it as it

comes to his land for any purpose to which it can be applied without material injury to the just rights of others. This right to the use of water in its natural flow is not an easement nor is it merely an appurtenance, but it is something inseparably annexed to the soil itself and exists *jure naturae* as parcel of the land. We think these principles will be found to be sustained by the authorities upon the subject. Gould on Waters, sections 204 to 224; *Mason v. Hill,* 5 B. & Ad., 1; *Wood v. Wand,* 3 Exch., 748; *Stockport Waterworks Company v. Potter,* 7 H. & N., 160; *Wilts, etc., Canal Co. v. Swindon Waterworks Company,* L. R. 9, Ch. App., 45 (s. c. L. R., 7 H. L., 697); 1 Farnham on Waters, secs. 62 to 65; *Mayor v. Warren Mfg. Co.,* 59 Md., 96. In *Prentice v. Geiger,* 74 N. Y., 345, the doctrine is thus stated: "The use of the water, as it passes, is the only right which, in the nature of things, he (the riparian proprietor) can have in it, and he acquires no exclusive right beyond its actual appropriation. But as all proprietors on the stream have an equal right to the use of the water and to share in the benefits from its use, the right of the several persons is not an absolute, but a qualified one, and the use of each must be such as is consistent with the substantial preservation of the equal rights of others. There are some uses which by common consent a riparian owner may have of the water, as it flows upon his premises, although such use may to some extent interfere with the use of the stream in its natural flow by the proprietors below. As, for example, the proprietor above may use the water for domestic purposes—the watering of cattle and the like— although such use may diminish the volume of the stream to the detriment of lower proprietors. The right to such uses, —without which all beneficial use of the water by the riparian owner would be prevented—is allowed *ex necessitate,* and is universally recognized."

Th court in *Wilts, etc., Canal Co. v. Swindon Waterworks Company, supra,* says: "All streams, however, are *publici*

*juris,* and all the water flowing down any stream is for the common use of mankind who live on the banks of the stream; and therefore any person living on the banks of the stream has an undoubted right to the use of the water for himself, his family, and his cattle, and for all ordinary domestic purposes, such as brewing, washing, and so on. Those are the common purposes of water in the ordinary mode of using water."

The principle is well stated in *Strobel v. Kerr Salt Co.,* 164 N. Y., at page 320, as follows: "A riparian owner is entitled to a reasonable use of the water flowing by his premises in a natural stream, as an incident to his ownership of the soil, and to have it transmitted to him without sensible alteration in quality or unreasonable diminution in quantity. While he does not own the running water, he has the right to a reasonable use of it as it passes his land. As all other owners upon the same stream have the same right, the right of no one is absolute, but is qualified by the right of others to have the stream substantially preserved in its natural size, flow and purity, and to protection against material diversion or pollution. This is the common right of all, which must not be interfered with by any. The use by each must, therefore, be consistent with the rights of others, and the maxim of *sic utere tuo* observed by all. The rule of the ancient common law is still in force; *aqua currit et debet currere, ut currere solebat.*"

After all that can be said, the question is whether the upper riparian proprietor is engaged in a reasonable exercise of his right to use the stream as it flows by or through his land, whether with or without retaining the water for a time or obstructing temporarily the accustomed flow, and whether he is so doing, as the above authorities show, is a question for the jury under the proper guidance of the court as to the law applicable to the particular state of facts. *Hayes v. Waldron,* 44 N. H., 580; *Strobel v. Kerr Salt Co., supra.*

DURHAM v. COTTON MILLS.

But in order that this right to have the water of a stream flow with undiminished quantity or unimpaired quality may be successfully asserted, the person who sets up a claim to its enjoyment must show that he is a riparian proprietor or that in some way he has acquired riparian rights in the stream. There is nothing in this case, as now presented, which tends to prove that the plaintiffs are riparian proprietors in respect to the Eno River. They do not allege that the city of Durham is the owner of any part of the banks of that stream, but, on the contrary, the proof tends to show that it is not. The Durham Water Company has a plant abutting on the river and has been using its waters for some years to supply the city of Durham, but that company for some unexplained reason has not been made a party to this suit, nor does it appear even by inference what kind of contract it has with the city for furnishing water. As to all of these matters, we are left without any information. It would seem, therefore, that we cannot proceed to administer relief to the plaintiffs by enjoining the acts of the defendant, if this case is treated simply as one for the suppression of a nuisance, unless we had more definite allegation and proof as to the right of the plaintiffs to maintain this action, without the presence in the record of the water company as a party. We express though no decided opinion as to this feature of the case, as we find it unnecessary to do so.

Assuming that the city of Durham is a riparian owner or has riparian rights in the river, we yet think that the plaintffs' proof falls short of being sufficient for the court to interpose at this stage of the case a preliminary injunction and restrain the defendant until the hearing from continuing to commit the acts alleged to be injurious to the plaintiffs. If the defendant, being an upper riparian proprietor, and as such entitled to the ordinary use of the water, including the right to apply it in a reasonable manner to domestic uses and even to purposes of trade and manufacture, is using the

water of the stream in an unreasonable manner and has defiled the same to such an extent as to constitute an actual invasion of the rights of the plaintiffs, then both are clearly entitled to redress by action at law, and in case the nuisance be continued, to summary relief by injunction. *Mayor v. Warren Mfg. Co., supra,* and cases cited. Injunction is undoubtedly a proper remedy to prevent the fouling of the water of a running stream by its improper and unreasonable use when prejudicial to the rights of others interested in having the water descend to them in its ordinary natural state of purity. *Goldsmith v. Turnbridge Wells Co.,* L. R. 1, Ch. App., 349, and cases *supra.* But have the plaintiffs made out any such case? They must not only establish that they have a right to be protected, but they must in addition show by satisfactory proof that the right has actually been infringed in some material way or that the defendant is about to commit some act which will tend so far to impair the right as that the damage will be irreparable. "It is a well settled rule of equity procedure that an injunction to restrain a nuisance will issue only in cases where the fact of nuisance is made out upon determinate and satisfactory evidence. If the evidence be conflicting, and the injury be doubtful, that will constitute a ground for withholding the process. When the interposition by injunction is sought to restrain that which it is apprehended will create a nuisance, the proof must show that the apprehension of material and irreparable injury is well grounded upon a state of facts from which it appears that the danger is real and immediate." *New York Aqueduct Board v. Passaic,* 45 N. J. Eq., 393; 2 Story Eq. Jur., 924a; *Brookline v. Mackintosh,* 133 Mass., 215; *Atty. Gen. v. Heishon,* 18 N. J. Eq., 410; 1 High on Injunctions (4 Ed.), secs. 774 and 811; *Crossley v. Lightowler,* L. R., 2 Ch. App., 483. In this case the plaintiffs have not shown by any satisfactory proof, such as the law requires, that the river at the intake of the water com-

pany has been polluted. It was an easy matter for the plaintiffs to have the water analyzed at the place where it is drawn into the mains through which it is conveyed to the city, and it appears by the evidence in the case that a chemical and bacteriological analysis could have been made, which would have ascertained with a reasonable degree of certainty at least whether the water had been corrupted at the intake by the sewage and waste material deposited in the stream at defendant's mill. There is proof on the part of the defendant that there are so many obstructions in the way of the passage of deleterious matter from the site of the mill to the intake and so many natural means presented for the renewal and purification of the stream by the influx of great quantities of fresh and pure water from its tributaries and by sedimentation as to make it improbable, if not impossible, that any deadly germs could "survive the journey" for so many miles between the two points on the river. The only evidence offered in answer to the proof introduced by the defendant and the inference to be fairly drawn from the failure to make a proper analysis to establish the contention which seems susceptible of demonstration in that way, are the opinions of several physicians and one or two laymen to the effect that the pollution at the outlet of the defendant's sewer will injuriously affect the water at the intake and endanger the health of the citizens of Durham who use the water taken from the river. Opinions of this kind are of the highest value under certain circumstances, but the law requires something more tangible and definite as a basis for seriously interfering with important industrial enterprises. In a case somewhat similar to this, in which just such proof was relied on, the court said: "Speaking with all possible respect to the scientific gentlemen who have given their evidence, we think that in cases of this nature much more weight is due to the facts which are proved than to conclusions drawn from scientific investigations. The conclusions to be drawn from

scientific investigations are no doubt in such cases of great value in aid of or in explanation or qualification of the facts which are proved, but in our judgment it is upon the facts which are proved, and not upon conclusions, we ought in these cases to rely. In our view, therefore, the scientific evidence ought to be considered as secondary only to the evidence as to the facts." *Goldsmith v. Turnbridge Wells Co.,* 1 Ch. App., 349. That case was reviewed at length and approved in *Newark Aqueduct Board v. Passaic, supra,* where a most learned discussion of the subject will be found, and the same may be said of *Mayor v. Warren Mfg. Co., supra,* where *Judge Alvey,* who delivered the opinion of the court, states with his usual clearness and force the true principles and grounds upon which the courts proceed in such cases as the one we have under consideration. See also *Missouri v. Illinois,* 180 U. S., 208; *Atty. Gen. v. Mayor,* 45 L. J., 736. The injury here is entirely prospective and it is only possible to form an opinion upon evidence which does not enable us to do more than conjecture whether the apprehension of the plaintiffs is well grounded and free from reasonable doubt So far as the present state of the proof goes, the jurisdiction of a court of equity is invoked to restrain that which is alleged may, or at the most will, create a nuisance, and not that which in fact does create a nuisance. *Missouri v. Ill.,* 26 Sup. Ct. Rep., 331; *Dorsey v. Allen,* 85 N. C., 358. But if the court should interfere by injunction, where it is merely probable that a nuisance will result from the acts of the defendant, we do not think the plaintiffs have sufficiently brought their case within the operation of this rule. *Ellison v. Commissioners,* 58 N. C., 57; *Barnes v. Calhoun,* 37 N. C., 199; *Simpson v. Justice,* 43 N. C., 115; *Vickers v. Durham,* 132 N. C., 880; *Dorsey v. Allen, supra; Stockton v. Railroad,* 50 N. J. Eq., 80. Proof easily accessible to the plaintiffs and which would have established the fact of nuisance beyond any doubt was not produced, but the court

is urged to resort to evidence of a secondary and less satisfactory nature upon which to determine the important rights of the parties. Under the facts and circumstances, as disclosed by the record, we would have been obliged to reverse the ruling of the court below and leave the plaintiffs to the necessity of making good their allegation of nuisance at the hearing, in order to entitle themselves to injunctive relief, and this course would be pursued, if we were confined in our investigation of this case to the mere fact of nuisance. But we are not so restricted, as the Legislature has spoken upon the subject of this controversy and it is our duty to give due heed to what it has said. Its declared will is the law and must be enforced, if it has been sufficiently expressed or by fair construction it can be ascertained. The Legislature by chapter 670 of the Laws of 1899 undertook to protect public water supplies from contamination by providing for a thorough system of inspection and the adoption of such sanitary measures as would be likely to contribute to that end. This law contained no provision as to the discharge of sewage into any streams of the State from which a public water supply is taken, but simply related to the subjects of inspection and sanitation. Believing that such a system was not adequate to the full protection of the people of this State from contamination of the water used for drinking and other domestic purposes, the Legislature passed another act, it being chapter 159 of the Laws of 1903, entitled, as the former act, "An Act to Protect Water Supplies." This act contained all the features of the Act of 1899 and provided generally in section 1 that water companies should take reasonable precautions to insure the purity of water supplied to the public. It is provided in section 2 that companies which are supplied from lakes, ponds or small streams not more than fifteen miles in length shall at their own expense have a sanitary inspection of their entire water shed not less than once in every three calendar months and special inspections

when circumstances seem to require them. It then directs how the inspection shall be made, namely, by a particular examination of the premises of every inhabitant of the water shed and a search in passing from house to house for dead bodies of animals or the accumulation of filth, excepting uninhabited fields and wooded tracts which are free from suspicion. Where the supply of water is drawn from rivers or large creeks having a minimum daily flow of ten million gallons the provisions of section 2 shall apply only to the fifteen miles of water shed draining into the said river or creek next above the intake of the water company. Provision is then made for an inspection by every city or town having a public water supply of its entire watershed, and it is declared to be a misdemeanor to deposit dead animals or human excreta on the watershed of any water supply or to defile, corrupt or pollute any well, spring, drain, branch, brook, creek or other source of a public water supply. Then follows section 13 of the act, which is as follows: "No person or municipality shall flow or discharge sewage into any drain, brook, creek or river from which a public drinking water supply is taken, unless the same shall have been passed through some well known system of sewage purification approved by the State Board of Health; and the continual flow and discharge of such sewage may be enjoined upon application of any person."

This act has been inserted in the Revisal as chapter 76 and is not materially different as there found from what it was in the original form. The provision in regard to the flowing or discharging of sewage into a stream from which a public water supply is taken, seems to be very explicit and susceptible of but one construction. The defendant contends: 1. That section 13 of chapter 159 of the Act of 1903, it being section 3051 of the Revisal, applies only to sewers maintained within the distance of fifteen miles above the intake, which is the watershed as defined in the second

and third sections of chapter 159 of the act and sections 3045 and 3046 of the Revisal. 2. That if the provision of section 13 is construed to apply to this defendant, whose mill is situated seventeen miles above the intake of the Durham Water Company, then it is unconstitutional and void as being in effect a taking of the defendant's property without condemnation and without compensation; in other words, it is confiscation. We cannot assent to either of these propositions. If we could think that the acts of the defendant are not within the inhibition of that law or that its property is about to be unlawfully taken or interfered with, we would not hesitate to interpose and protect it from such contemplated action. But the meaning of the Legislature is so clear to us and its power thus to legislate is so well established, that we could not so act without plainly disregarding the mandate of the law-making body given in the rightful exercise of its constitutional power. As to the defendant's first contention, it is clear that by the second and third sections of the act the Legislature intended to establish a watershed solely for the purpose of inspection. This is to be deduced from the very language in those sections and, further, it appears from the manner in which the inspection is required to be made that sewage was not the source of infection or pollution intended to be guarded against by the inspection of the watershed. It is plainly excluded by the very terms of those two sections. At least it so appears to us. But if there could be any doubt as to the true meaning of that part of the act, we think that section 13 (Revisal, section 3051), which is quoted above, is so broadly worded as to absolutely preclude the construction that the Legislature intended to limit the acts therein. prohibited to be done to the watershed of fifteen miles above the intake. We can give to that section no other meaning unless we read into it something that is not there and clearly not intended to be there. The act forbidden is "the flow or discharge of sewage into any river

from which a public drinking supply is taken," unless puri-
fied as therein provided.  It does not confine its operation
to the watershed, but extends to any stream from which
water is taken to be supplied to the public for drinking pur-
poses.  To limit its scope as suggested would be to defeat
the clearly expressed intent of the Legislature, and this we
are not permitted to do.  We entertain no doubt as to what
was intended and we are constrained to hold that the admitted
acts of the defendant are within the prohibition of the statute.

The second position is equally untenable.  It will be ob-
served by reading the act that it is not required that the
sewage discharged into the stream should injuriously affect
the water at the intake; it is quite sufficient if it pollutes the
river at the sewer's outlet.  The Legislature has decided that
it is desirable to preserve our natural streams in at least their
present state of purity, and where they have been polluted,
to remove the cause as speedily and effectually as possible.
It has, therefore, said that no person shall deteriorate the
water at all by sending sewage into a natural stream until it
has been purified and made wholesome or until all the noxious
matter in it has been eliminated.  And this means, of course,
that the water shall not be poisoned by sewage at the outfall.
We must assume that the defilement of the water is an injury
which is forbidden by the Legislature for perfectly good and
sufficient reasons.  It is not for us to question the policy or
expediency of such an enactment.  In this respect the Leg-
islature has a large discretion to be exercised in such way as
will in its judgment promote the interests and advance the
welfare of the people, and it has this discretion to such an
extent as to be virtually a law unto itself so far as the man-
ner of its exercise is concerned.  Such legislation is not in-
tended merely to abate an existing nuisance, but to prevent
that being done which is a menace to the public health and
which it is supposed may become a deadly peril and a public
nuisance because fatal in its consequences.  It is not, there-

fore, a void law because it is founded upon mere apprehension of evil, but is a precautionary measure which is clearly within the police power of the State and to be adopted when deemed necessary to secure the public health. We think the general principles we have thus stated will be found clearly stated by *Sir George Jessel,* for the court, and supported by cogent reasoning in *Attorney-General v. Cockermouth Local Board, L. R.,* 18 Eq., 172. That case and this one are not unlike in the facts to which the principle was applied. But a more elaborate treatment of the doctrine in its relation to the police power as its basis, will be found in *State v. Wheeler,* 44 N. J. L., 88. The facts in that case were also like those we now have before us in this record. The language of *Judge Magie,* speaking for the court, would seem to have been uttered with reference to the facts we have here, did we not know that it was actually used in another case. Its appositeness must be our apology for quoting copiously from that case. The court says: "The whole act plainly shows a design to protect from pollution the waters of creeks, etc., used as the feeders for reservoirs for public use, without any reference to whether such pollution in fact appreciably affects the waters when arrived at the reservoir. Nor does such a construction render this act objectionable. The design of the act is not to take property for public use, nor does it do so within the meaning of the Constitution. It is intended to restrain and regulate the use of private property so as to protect the common right of all the citizens of the State. Such acts are plainly within the police power of the Legislature, which power is the mere application to the whole community of the maxim, '*sic utere tuo, ut alienum non laedas.*' Nor does such a restraint, although it may interfere with the profitable use of the property by its owner, make it an appropriation to a public use so as to entitle him to compensation. Of the right of the Legislature thus to restrain the use of private property in order to secure the gen-

DURHAM *v.* COTTON MILLS.

eral comfort, health and prosperity of the State, 'no question ever was or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned.' *Redfield, C. J.,* in *Thorpe v. Rutland R. R.,* 27 Vt., 149. The same view has been always held in this State, and notably in the case of *State v. Common Pleas of Morris,* 7 Vroom, 72. It was also there held that the extent to which such interference with the injurious use of property may be carried, is a matter exclusively for the judgment of the Legislature when not controlled by fundamental law. Nor is there anything to render such legislation objectionable because in some instances it may restrain the profitable use of private property, when such use in fact does not directly injure the public in comfort or health. For to limit such legislation to cases where mutual injury has occurred, would be to deprive it of its most effective force. Its design is preventive, and to be effective it must be able to restrain acts which tend to produce public injury. Many instances of such an exercise of this power can be found. The State regulates the use of property in intoxicating liquors by restraining their sale, not on the ground that each particular sale does injury, for then the sale would be prohibited, but for the reason that their unrestricted sale tends to injure the public morals and comfort. The State is not bound to wait until contagion is communicated from a hospital established in the heart of a city—it may prohibit the establishment of such a hospital there, because it is likely to spread contagion. So the keeping of dangerous explosives and inflammable substances, and the erection of buildings of combustible materials within the limits of a dense population, may be prohibited because of the probability or possibility of public injury. Such instances might be indefinitely multiplied, but these are sufficient to illustrate this case. The object of this legislation is to protect the public comfort and health. For that purpose the Legislature may restrain any use of private property

which tends to the injury of those public interests. That the pollution of the sources of the public water supply does so tend, no one will deny."

We might well content ourselves with stopping here and resting our judgment upon the unanswerable argument there presented, and we would do so but for the great importance of the question and far-reaching consequences of our decision. The police power, by virtue of which this legislation is vindicated and justified, is no new or unusual exercise of the sovereign will. It had its origin in the most ancient maxims of jurisprudence. All property was originally acquired subject to regulation in its use by those cardinal principles embodied in the maxim, "The safety of the people is the supreme law," and that other maxim, "So use your own as not to injure another." This was the original condition imposed upon the right of property in things, that it should be enjoyed subject to reasonable regulations when considered necessary to promote the general good of society. A good statement of the nature and extent of this police power is to be found in *Thorpe v. Railway Co.*, 27 Vt., 140, where *Redfield, C. J.,* says: "This police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State, according to the maxim, *sic utere tuo, ut alienum non laedas,* which being of universal application, it must of course be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. There is also the general police power of the State, by which persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State, of the perfect right, in the Legislature, to do which no question ever was, or, upon acknowledged general principles, ever can be made, so far as natural persons are concerned. And it is certainly calculated to excite surprise and alarm, that the right to do so

in regard to railways should be made a serious question. This objection is made generally upon two grounds: 1. That it subjects corporations to virtual destruction by the Legislature; and, 2. That it is an attempt to control the obligation of one person to another, in matters of merely private concern. The first point has already been somewhat labored. It is admitted that the essential franchise of a private corporation is recognized by the best authority as private property, and cannot be taken without compensation, even for public use."

He then proceeds to demonstrate conclusively that the police power resides primarily and ultimately in the Legislature, and that private interests of every kind fall legitimately within the range of legislative control, both in regard to natural and artificial persons. "It seems incredible," he says, "how any doubt should have arisen upon the point now before the court. And it would seem it could not, except from some undefined apprehension, which seems to have prevailed to a considerable extent, that a corporation did possess some more exclusive powers and privileges upon the subject of its business, than a natural person in the same business, with equal power to pursue and to accomplish it, which, I trust, has been sufficiently denied." The general conclusion reached is that there can be no manner of doubt that the Legislature may, if the public good is deemed to demand it—of which it is the judge, its judgment in all doubtful cases being final—require property to be used by persons, as well as their business to be conducted, so as to prevent harm or injury to the public. The same principle is strongly stated in *State v. Common Pleas of Morris,* 36 N. J. L., 72. "While alcoholic stimulants are recognized as property and are entitled to the protection of the law, ownership in them is subject to such restraints as are demanded by the highest considerations of public expediency. Such enactments are regarded as police regulations, established for the

prevention of pauperism and crime, for the abatement of nuisances and the promotion of public health and safety. They are a just restraint of an injurious use of property, which the Legislature has authority to impose, and the extent to which such interference may be carried must rest exclusively in legislative wisdom where it is not controlled by fundamental law. It is a settled principle, essential to the right of self-preservation in every organized community, that however absolute may be the owner's title to his property, he holds it under the implied condition 'that its use shall not work injury to the equal enjoyment and safety of others, who have an equal right to the enjoyment of their property, nor be injurious to the community.' Rights of property are subject to such limitations as are demanded by the common welfare of society, and it is within the range and scope of legislative action to declare what general regulations shall be deemed expedient. If, therefore, the Legislature shall consider the retail of ardent spirits injurious to citizens, or productive of idleness and vice, it may provide for its total suppression. Such inhibition is justified only as a police regulation, and its legality has been recognized in well considered cases. It is neither in conflict with the power of Congress over subjects within its exclusive jurisdiction, nor with any provisions of our State Constitution, nor with general fundamental principles. Cooley on Cons. Limitations, p. 583, and cases there referred to; *Thurlow v. Massachusetts,* 5 How., 504. It is not necessary to amplify discussion on this point, or to criticise the cases in detail. The view here taken underlies the whole subject of police regulations, and cannot logically be narrowed in its application."

In *Commissioners v. Alger,* 7 Cush., 53, *Chief Justice Shaw,* referring to the police power, says: "This is very different from the right of eminent domain, the right of a government to take and appropriate private property to

public use, whenever the public exigency requires it; which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power, the power vested in the Legislature by the Constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to mark its boundaries, or prescribe limits of its exercise. There are many cases in which such a power is exercised by all well ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable." He then cites numerous instances in which the power can be rightfully exercised, and among them the use of property near inhabited villages in such a way as to produce dangerous exhalations, injurious to health and dangerous to life, and proceeds: "Nor does the prohibition of such noxious use of property, a prohibition imposed because such use would be injurious to the public, although it may diminish the profits of the owner, make it an appropriation to a public use, so as to entitle the owner to compensation. He (the owner) is restrained, not because the public have occasion to make any use of the property, or to make any benefit or profit to themselves from it; but because it would be a noxious use, contrary to the maxim, *sic utere tuo, ut alienum non laedas.* It is not an appropriation of the property to a public use, but the restraint of an injurious private use by the owner, and is therefore not within the principle of property taken under the right of eminent domain." A case directly in point is *State v. Streeper,* 5 N. J. L., 115.

The very contention made in this case that the property of the defendant is taken unlawfully and without due pro-

cess of law, and that it is denied the equal protection of the laws, thereby violating the fourteenth amendment to the Constitution of the United States, was fully met and answered in *Mugler v. Kansas,* 123 U. S., 623, a leading and authoritative decision upon this question. The court, by *Harlan, J.,* there says: "Undoubtedly the State, when providing by legislation for the protection of the public health, the public morals or the public safety, is subject to the Constitution of the United States, and may not violate rights secured or guaranteed by that instrument, or interfere with the execution of the powers confided to the general government. But neither the fourteenth amendment, broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity." He then asks the question, "Who shall determine whether the particular use of property is injurious to the public?" and gives this answer: "Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the State, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health, or the public safety." Summing up and stating the result of all the decisions of that court, it is further said: "The principle, that no person shall be deprived of life, liberty, or property, without due process of law, was embodied in substance in the Constitutions of nearly all, if not all, of the States at the time of the adoption of the fourteenth amendment; and it has never been regarded as incompatible with the princi-

ple,. equally vital, because essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. This court has, nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding State police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health and property which each State owes to her citizens. A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. Such legislation does not disturb the owner in the control or use of his property for lawful purposes, nor restrict his right to dispose of it, but is only a declaration by the State that its use by any one, for certain forbidden purposes, is prejudicial to the public interests."

It was said in *Munn v. Illinois,* 94 U. S., 124, that while power does not exist with the whole people to control rights that are purely and exclusively private, government may require "each citizen to so conduct himself, and to use his own property, as not unnecessarily to injure another. This is the very essence of government; and has found expression in the maxim, *sic utere tuo, ut alienum non laedas.* From this source come the police powers, which, as was said by *Chief Justice Taney,* in the *License cases,* 5 How., 583, are nothing more nor less than the powers of government inherent in every sovereignty, that is to say, the power to govern men and things." And again at page 124: "A body politic is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good." The same court said in *Beer Co. v. Massachu-*

*setts,* 97 U. S., 32: "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the Legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the State." But the case of *Fertilizing Company v. Hyde Park,* 97 U. S., 659, seems to be directly in point. It involved the validity of an ordinance against conducting an unwholesome business within the corporate limits of the village of Hyde Park, and the plaintiff, who at great expense had erected fertilizer works in the county and transported animal matter through the village, sought to enjoin the enforcement of the ordinance which it claimed would utterly ruin its business. The same contention was made there as here. The court in *Mugler v. Kansas,* 123 U. S., at page 666, referring to that case and answering the contention, said: "The enforcement of the ordinance in question operated to destroy the business of the company, and seriously to impair the value of its property. As, however, its business had become a nuisance to the community in which it was conducted, producing discomfort, and often sickness, among large masses of people, the court maintained the authority of the village, acting under legislative sanction, to protect the public health against such nuisance. It (the court) said: 'We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases. It rests upon the fundamental principle that every one shall so use his own as not to wrong and injure another. To regulate and abate nuisances is one of its ordinary functions.' "

Cases might be cited almost without number to sustain

the general proposition now being considered. We will refer to several decided in the courts of other States which have a direct bearing upon the question. *State v. Griffin,* 69 N. H., 1; *City of Durango v. Chapman,* 27 Colo., 169; *Com. v. Russell,* 172 Pa. St., 506; *Haskell v. New Bedford,* 108 *Mass.,* 208.

This court has said in *Brown v. Keener,* 74 N. C., 714: "It is too late to question that the public power of a State (which is a part of its general legislative power) extends to the providing for every object which may be reasonably considered necessary for the public safety, health, good order or prosperity, and which is not forbidden by some restriction in the State or Federal Constitution, or by some recognized principle of right and justice found in the common law. It is unnecessary to consider at present the limits of this extensive power, since it clearly includes the right to provide for and compel the clearing out not only of such water courses as are naturally navigable, but of all such water courses and drains as are not and never were navigable, but which are necessary for carrying off the surplus rain water, thereby promoting the public health, and enabling a considerable portion of territory otherwise uninhabitable to be brought into cultivation. *Norfleet v. Cromwell,* 70 N. C., 634; *People v. Mayor of Brooklyn,* 4 N. Y., 440; *Coster v. Tidewater Company,* 18 N. J. Eq., 54; *State v. Blake,* 36 N. J. L., 442; *Reeves v. Treasurer of Wood County,* 8 Ohio St., 343; Cooley Const. Lim., chap. 16; 2 Dillon Mun. Corp., sec. 506." Other cases which have been decided by this court involving in one form or another questions arising out of the exercise of the police power are: *State v. Muse,* 20 N. C., 463; *Intendant v. Sorrell,* 46 N. C., 49; *Pool v. Trexler,* 76 N. C., 297; *Norfleet v. Cromwell,* 70 N. C., 634; *State v. Joyner,* 81 N. C., 534; *Winslow v. Winslow,* 95 N. C., 24; *State v. Yopp,* 97 N. C., 477; *State v. Pendergrass,* 106 N. C., 664; *State v. Stovall,* 103 N. C., 416;

*State v. Hay,* 126 N. C., 999; *Hutchins v. Durham,* 137 N. C., 68; *State v. McGinnis,* 138 N. C., 724.

It is of course no defense that pure and wholesome water can be obtained from other sources than the Eno River. 2 Farnham on Waters, sec. 515. The fact is that the water supply of Durham is drawn from that stream and that is what protects it under the act from being fouled by sewage. The preservation of the public health was the chief concern of the Legislature and the purpose of the act was to remove any possible danger which should menace it. Whether the plaintiffs would have any standing in court without the aid of the statute, and if left to depend upon its right to use the water of the Eno River under its contract with the water company, if it has one, is a question not presented for consideration, and upon it we express no opinion. Our decision must rest solely on the provisions of the statute, which is susceptible of but one meaning, and which declares explicitly that streams used as is the Eno River shall not be polluted, as disease may be communicated to the inhabitants of towns and cities by the use of the water. The fact that the public supply is taken from the stream is sufficient to bring it within the protection of the act, for we must construe the law as it is written and according to its true intent, looking at the evil sought to be remedied and giving it such effect as will not in the least disappoint the will of the people as expressed therein. If any hardship results, it is not from the construction of the law, but from the law itself and the declared policy of the State that the public health must be safeguarded. The welfare of the public is considered in law superior to the interests of individuals, and when there is a conflict between them, the latter must give way. *"Necessitas publica major est quam privata."* As the law is plainly written, so must we decide. The remedy of those who may suffer, is by an appeal to the law-making body, who alone can abate the rigor of its enactment.

The judgment must be affirmed, but the court below may so draw its order as to give the defendant a reasonable opportunity to comply with the statute. The injunction should operate so as to produce the least possible injury to the defendant's property and business consistent with the maintenance of the rights and interests of the public.

Affirmed.