IN THE SUPREME COURT OF NORTH CAROLINA

No. 56PA14-2

Filed 10 June 2016

EVERETTE E. KIRBY and wife, MARTHA KIRBY; HARRIS TRIAD HOMES, INC.; MICHAEL HENDRIX, as Executor of the Estate of Frances Hendrix; DARREN ENGELKEMIER; IAN HUTAGALUNG; SYLVIA MAENDL; STEVEN DAVID STEPT; JAMES W. NELSON and wife, PHYLLIS H. NELSON; and REPUBLIC PROPERTIES, LLC, a North Carolina company (Group 1 Plaintiffs)

v.

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 769 S.E.2d 218 (2015), reversing orders entered on 8 January 2013 and 20 June 2013 by Judge John O. Craig, III in Superior Court, Forsyth County, and remanding for further proceedings. Heard in the Supreme Court on 16 February 2016.

*Hendrick Bryant Nerhood Sanders & Otis, LLP, by Matthew H. Bryant, T. Paul Hendrick, Timothy Nerhood, Kenneth C. Otis III, and W. Kirk Sanders, for plaintiff-appellees.*

*Roy Cooper, Attorney General, by John F. Maddrey, Solicitor General, for defendant-appellant.*

*Jonathan D. Guze for John Locke Foundation, amicus curiae.*

*Hansen Law Firm, PLLC, by Jessica O. Wilkie and Joshua D. Hansen; and Van Winkle Law Firm, by Jones P. Byrd, for North Carolina Advocates for Justice, amicus curiae.*

*Martin & Gifford, PLLC, by G. Wilson Martin, Jr.; and Wait Law, P.L.L.C., by John L. Wait, for North Carolina Association of Realtors, Inc., amicus curiae.*

*Carlene McNulty for North Carolina Justice Center, amicus curiae.*

*Elliot Engstrom for Civitas Institute, Center for Law and Freedom; and Mark*

*Miller, pro hac vice, for Pacific Legal Foundation, amici curiae.*

*Shanklin & Nichols, LLP, by Kenneth A. Shanklin and Matthew A. Nichols, for Wilmington Urban Area Metropolitan Planning Organization, amicus curiae.*

NEWBY, Justice.

In this case we consider whether the use of the Map Act by the North Carolina Department of Transportation (NCDOT) resulted in a taking of certain property rights of plaintiffs without just compensation. Upon NCDOT's recording of the highway corridor maps at issue here, the Map Act restricted plaintiffs' fundamental rights to improve, develop, and subdivide their property for an unlimited period of time. These restraints, coupled with their indefinite nature, constitute a taking of plaintiffs' elemental property rights by eminent domain. The extent to which plaintiffs may be entitled to just compensation, however, depends upon market valuation of the property before and after the taking. Such determinations must be made on an individual, property-by-property basis. We therefore affirm the decision of the Court of Appeals.

In 1987 the General Assembly adopted the Roadway Corridor Official Map Act (Map Act). Act of Aug. 7, 1987, ch. 747, sec. 19, 1987 N.C. Sess. Laws 1520, 1538-43 (codified as amended at N.C.G.S. §§ 136-44.50 to -44.54 (2015)); *see also* N.C.G.S. §§ 105-277.9 to -277.9A, 160A-458.4 (2015). Under the Map Act, once NCDOT files a highway corridor map with the county register of deeds, the Act imposes certain

restrictions upon property located within the corridor for an indefinite period of time. N.C.G.S. § 136-44.51. After a corridor map is filed, "no building permit shall be issued for any building or structure or part thereof located within the transportation corridor, nor shall approval of a subdivision, as defined in G.S. 153A-335 and G.S. 160A-376, be granted with respect to property within the transportation corridor." *Id.* § 136-44.51(a); *see also id.* § 153A-335(a) (2015) (" '[S]ubdivision' means all divisions of a tract or parcel of land into two or more lots, building sites, or other divisions when any one or more of those divisions are created for the purpose of sale or building development (whether immediate or future) and includes all division of land involving the dedication of a new street or a change in existing streets . . . ."); *id.* § 160A-376(a) (2015) (same). Recognizing the impact of these restrictions, the General Assembly also designated the property as a "special class" for *ad valorem* tax purposes, assessed at reduced rates of "twenty percent (20%) of the appraised value" for unimproved property, *id.* § 105-277.9, and "fifty percent (50%) of the appraised value" for improved property, *id.* § 105-277.9A. Despite the restrictions on improvement, development, and subdivision of the affected property, or the tax benefits provided, NCDOT is not obligated to build or complete the highway project.

Owners whose properties are located within the highway corridor may seek administrative relief from these restrictions by applying for a building permit or subdivision plat approval, *id.* § 136-44.51(a)-(c), a variance, *id.* § 136-44.52, or an "advanced acquisition" of the property "due to an imposed hardship," *id.* § 136-44.53.

In the first instance, if after three years a property owner's application for a building permit or subdivision plat has not been approved, the "entity that adopted the transportation corridor official map" must either approve the application or initiate acquisition proceedings, or else the applicant "may treat the real property as unencumbered." *Id.* § 136-44.51(b). In the second instance, "[a] variance may be granted upon a showing that: (1) Even with the tax benefits authorized by this Article, no reasonable return may be earned from the land; and (2) The requirements of G.S. 136-44.51 result in practical difficulties or unnecessary hardships." *Id.* § 136-44.52(d). In the third instance, an "advanced acquisition" may be made upon establishing "an undue hardship on the affected property owner." *Id.* § 136-44.53(a). Property approved under the hardship category must be acquired within three years or "the restrictions of the map shall be removed from the property." *Id.* In all instances, however, the restrictions imposed upon the property remain indefinitely, absent affirmative action by the owner and either approval from the State or a certain lapse of time.

Plaintiffs are landowners whose properties are located within either the Western or Eastern Loops of the Northern Beltway, a highway project planned around Winston-Salem. Plaintiffs allege that the project "has been planned since 1965, and shown on planning maps since at least 1987 with the route determined by the early 1990s."

On 6 October 1997, in accordance with the Map Act, NCDOT recorded a highway transportation corridor map with the Forsyth County Register of Deeds that plotted the Western Loop of the Northern Beltway. Plaintiffs whose properties are located within the Western Loop had all acquired their properties before NCDOT recorded the pertinent corridor map. On 26 November 2008, NCDOT recorded a second map that plotted the Eastern Loop. Plaintiffs whose properties are located within the Eastern Loop had also purchased their properties before NCDOT recorded that corridor map, some as recently as 2006. The parties do not dispute that the Map Act imposed restrictions on property development and division as soon as NCDOT recorded the corridor maps.

The NCDOT has voluntarily purchased at least 454 properties within the beltway through condemnation proceedings, and since July 2010, has continued to purchase property located in the Western and Eastern Loops. In June 2013, NCDOT announced a public hearing regarding modification of the Western Loop boundaries, noting that "[a] 'Protected Corridor' has been identified that includes the areas of the beltway that the Department expects to purchase to build the proposed road." At the hearing an NCDOT official advised that "no funding for the proposed Western Section of the Northern Beltway had been included in the current" budget through 2020 and that there was "no schedule" establishing when construction would start.

From October 2011 to April 2012, following denial of their motion for class certification, *Beroth Oil Co. v. NCDOT (Beroth II)*, 367 N.C. 333, 347, 757 S.E.2d 466,

477 (2014), *aff'g in part and vacating in part Beroth Oil Co. v. NCDOT (Beroth I)*, 220 N.C. App. 419, 725 S.E.2d 651 (2012), plaintiffs filed separate complaints against NCDOT, asserting various, similar constitutional claims related to takings without just compensation, including inverse condemnation. On 31 July 2012, the Chief Justice certified plaintiffs' cases as "exceptional" under Rule 2.1 of the General Rules of Practice for the Superior and District Courts, and the trial court subsequently consolidated plaintiffs into the same group for case management purposes.[1]

The NCDOT timely answered, asserted various affirmative defenses, including, *inter alia*, lack of standing, and moved to dismiss plaintiffs' claims under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the North Carolina Rules of Civil Procedure. On 8 January 2013, the trial court entered an order denying NCDOT's motion to dismiss the claim for inverse condemnation.

All parties moved for summary judgment. The trial court first determined that plaintiffs failed to establish a taking, reasoning that "a regulatory taking" by police power only occurs when the legislation "deprive[s] the property of *all* practical use, or of *all* reasonable value" (citing and quoting *Beroth I*, 220 N.C. App. at 436-39, 725 S.E.2d at 661-63), and that the "mere recording of project maps do[es] not constitute a taking" (citing, *inter alia*, *Browning v. N.C. State Highway Comm'n*, 263 N.C. 130,

---

[1] For clarity we will refer to plaintiffs' similar collective "claims" in the singular—for example, plaintiffs' inverse condemnation claim. Other plaintiffs were consolidated into other groups; however, those claims are not before this Court on appeal here.

135-36, 139 S.E.2d 227, 230-31 (1964)). Therefore, the trial court concluded the inverse condemnation claim was "not yet ripe" and granted summary judgment for NCDOT, dismissing the claim without prejudice.[2] Plaintiffs appealed the dismissal and summary judgment orders to the Court of Appeals, and NCDOT cross-appealed the same, arguing for dismissal "with prejudice."

The Court of Appeals reversed the dismissal of plaintiffs' inverse condemnation claim. *Kirby v. NCDOT*, ___ N.C. App. ___, ___, 769 S.E.2d 218, 236 (2015).[3] The Court of Appeals concluded that, unlike regulations under the police power, which the State deploys to protect the public from injury, "the Map Act is a cost-controlling mechanism," *id.* at ___, 769 S.E.2d at 232, that employs the power of eminent domain, allowing NCDOT "to foreshadow which properties will eventually be taken for roadway projects and in turn, decrease the future price the State must pay to obtain

---

[2] Plaintiffs alleged the taking occurred solely on the dates "the maps were published" and not "on any other dates." The trial court noted that "in the future, the police powers granted by the Map Act could deprive the landowners of all practical use or all reasonable value of their land," but that plaintiffs had failed to establish a sufficient level of deprivation for a taking at that time. Not at issue here, the trial court also dismissed plaintiffs' remaining takings claims with prejudice and dismissed plaintiffs' claim for declaratory judgment without prejudice.

[3] The Court of Appeals declined to reach plaintiffs' other claims because its "disposition allow[ed] the trial court, upon consideration of evidence to be presented by Plaintiffs, to award Plaintiffs the relief they sought in their respective complaints." *Kirby*, ___ N.C. App. at ___, 769 S.E.2d at 236. The court "further decline[d] to address any remaining assertions for which Plaintiffs and NCDOT—as appellants and cross-appellants, respectively—have failed to present argument supported by persuasive or binding legal authority." *Id.* at ___, 769 S.E.2d at 236.

those affected parcels," *id.* at ___, 769 S.E.2d at 232 (quoting *Beroth II*, 367 N.C. at 349, 757 S.E.2d at 478 (Newby, J., dissenting in part and concurring in part)). The Court of Appeals determined that the Map Act imposed restrictions on "Plaintiffs' ability to freely improve, develop, and dispose of their own property," *id.* at ___, 769 S.E.2d at 235, that "never expire," *id.* at ___, 769 S.E.2d at 234 (quoting *Beroth II*, 367 N.C. at 349, 757 S.E.2d at 478), and that, as a result, the Map Act effectuated a taking of their "elemental [property] rights," *id.* at ___, 769 S.E.2d at 234. Therefore, the Court of Appeals concluded that plaintiffs' inverse condemnation claim was ripe and remanded the matter for a "discrete fact-specific inquiry," *id.* at ___, 769 S.E.2d at 235 (quoting and discussing *Beroth II*, 367 N.C. at 343, 757 S.E.2d at 474 (majority opinion)), to determine "the amount of compensation due," *id.* at ___, 769 S.E.2d at 236.

We allowed NCDOT's petition for discretionary review. We review orders granting summary judgment and dismissal de novo and "view the allegations as true and the supporting record in the light most favorable to the non-moving party." *E.g.*, *Mangum v. Raleigh Bd. of Adjust.*, 362 N.C. 640, 644, 669 S.E.2d 279, 283 (2008).

The NCDOT contends that the Map Act is a valid, regulatory exercise of the police power, not the power of eminent domain, and that therefore no taking has occurred. The NCDOT asserts that "cost-cutting" is not the only underlying purpose of the Map Act and, quoting *Blades v. City of Raleigh*, 280 N.C. 531, 546, 187 S.E.2d 35, 43 (1972), argues that the Act promotes the general welfare of the public "by

conserving the values of other properties and encouraging the[ir] most appropriate use." The NCDOT points to "facilitating orderly and predictable development" with "the least impact on the natural and human environments, and minimizing the number of businesses, homeowners and renters who will have to be relocated when a [highway] project is authorized for right-of-way acquisition and road construction" in support of its contentions. While these policies are laudable, we do not agree that the Map Act is a valid, regulatory exercise of the police power. We concur with the analysis of the Court of Appeals.

The fundamental right to property is as old as our state. *See* N.C. Const. of 1776, Declaration of Rights § XII; *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 9 (1787); *see also* 2 William Blackstone, *Commentaries* \*138 ("The third absolute right, inherent in every [man], is that of property: which consists in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land."). Public policy has long favored the "free and unrestricted use and enjoyment of land." *J.T. Hobby & Son, Inc. v. Family Homes of Wake Cty., Inc.*, 302 N.C. 64, 71, 274 S.E.2d 174, 179 (1981) (citations omitted); *see* N.C.G.S. § 47B-1(1) (2015) ("Land . . . should be made freely alienable and marketable so far as is practicable."). "Property" encompasses "every aspect of right and interest capable of being enjoyed as such upon which it is practicable to place a money value" and includes "not only the thing possessed but . . . the right of the owner to the land; the right to possess, use, enjoy and dispose of it, and the corresponding right to exclude

others from its use." *Hildebrand v. So. Bell Tel. & Tel. Co.*, 219 N.C. 402, 408, 14 S.E.2d 252, 256 (1941).

From the very beginnings of our republic we have jealously guarded against the governmental taking of property. *See* John Locke, *Two Treatises of Government* 295 (London, Whitmore & Fenn et al. 1821) (1689) ("The great and *chief end*, therefore, of men's uniting into commonwealths, and putting themselves under government, *is the preservation of their property*."); James Madison, *Property* (1792), *reprinted in* 6 *The Writings of James Madison* 101, 102 (Gaillard Hunt ed., 1906) ("Government is instituted to protect property of every sort; as well as that which lies in the various rights of individuals, as that which the term particularly expresses."). Though our state constitution does not contain "an express constitutional provision against the 'taking' or 'damaging' of private property for public use" without payment of just compensation, we have long recognized the existence of a constitutional protection against an uncompensated taking and "the fundamental right to just compensation as so grounded in natural law and justice" that it is considered "an integral part of 'the law of the land' within the meaning of Article 1, Section 19 of our [North Carolina] Constitution." *Long v. City of Charlotte*, 306 N.C. 187, 195-96, 293 S.E.2d 101, 107-08 (1982) (footnotes and citations omitted), *superseded on other grounds by statute*, Act of July 10, 1981, ch. 919, sec. 28, 1981 N.C. Sess. Laws 1382, 1402; *see also* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 67-72 (2d ed. 2013) (discussing the development and interpretation of

the Law of the Land Clause). "Property" clearly includes the rights to improve, develop, and subdivide, which were severely and indefinitely restricted here by the Map Act. Our recognition of the impact of the Map Act's restrictions on property rights, however, does not end the inquiry.

Determining if governmental action constitutes a taking depends upon "whether a particular act is an exercise of the police power or of the power of eminent domain." *Barnes v. N.C. State Highway Comm'n*, 257 N.C. 507, 514, 126 S.E.2d 732, 737-38 (1962) (quoting 11 Eugene McQuillin, *The Law of Municipal Corporations* § 32.27, at 319 (Ray Smith ed., Callaghan & Co. 3d ed. 1950)). Under the police power, the government *regulates* property to prevent injury to the public. *Beroth II*, 367 N.C. at 351, 757 S.E.2d at 479 (Newby, J., dissenting in part and concurring in part); *City of Durham v. Eno Cotton Mills*, 141 N.C. 615, 637, 54 S.E. 453, 461 (1906) ("[T]he right of property . . . [is] enjoyed subject to reasonable regulations . . . ." "The safety of the people is the supreme law . . . ."). Police power regulations must be "enacted in good faith, and ha[ve] appropriate and direct connection with that protection to life, health, and property which each State owes to her citizens." *Eno Cotton Mills*, 141 N.C. at 642, 54 S.E. at 462 (quoting *Mugler v. Kansas*, 123 U.S. 623, 666, 8 S. Ct. 273, 299, 31 L. Ed. 205, 212 (1887)). An exercise of police power outside these bounds may result in a taking. *See Responsible Citizens v. City of Asheville*, 308 N.C. 255, 261-62, 302 S.E.2d 204, 208-09 (1983).

Under the power of eminent domain, the government *takes* property for public use because such action is advantageous or beneficial to the public. *Beroth II*, 367 N.C. at 351, 757 S.E.2d at 479. "[T]he sovereign determines the nature and extent of the property required . . . [and] may take for a limited period of time or in perpetuity . . . an easement, a mere limited use, . . . [or] an absolute, unqualified fee . . . ." *Town of Morganton v. Hutton & Bourbonnais Co.*, 251 N.C. 531, 533, 112 S.E.2d 111, 113 (1960) (citations omitted). As such, "[t]he state must compensate for property rights taken by eminent domain; [however,] damages resulting from the [proper] exercise of [the] police power are noncompensable." *Barnes*, 257 N.C. at 514, 126 S.E.2d at 738 (quoting *State v. Fox*, 53 Wash. 2d 216, 220, 332 P.2d 943, 946 (1958)).

The language of the Map Act plainly points to future condemnation of land in the development of corridor highway projects, thus requiring NCDOT to invoke eminent domain. *See Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) ("The best indicia of [legislative] intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish." (citations omitted)). Section 136-44.50 contemplates the filing of "a transportation corridor official map" that has been adopted or amended by a governing board overseeing a "long-range transportation plan," and "establishment of" an "official map or amendment" triggers the beginning of "environmental impact studies" and "preliminary engineering work." Sections 136-44.51 to -44.53 provide

not only for approval of a building permit or variance but establish procedures for "advanced acquisition of" the property.

The Map Act's indefinite restraint on fundamental property rights is squarely outside the scope of the police power. *See Eno Cotton Mills*, 141 N.C. at 641-42, 54 S.E. at 462. No environmental, development, or relocation concerns arise absent the highway project and the accompanying condemnation itself. *See, e.g.*, *Town of Wake Forest v. Medlin*, 199 N.C. 83, 85-86, 154 S.E. 29, 30-31 (1930) (providing examples of police power regulations for protection against nuisances). Justifying the exercise of governmental power in this way would allow the State to hinder property rights indefinitely for a project that may never be built. *See State v. Vestal*, 281 N.C. 517, 523, 189 S.E.2d 152, 157 (1972) ("His property may not be taken . . . without compensation, under the guise of a regulation of his business pursuant to the police power."). Though the reduction in acquisition costs for highway development properties is a laudable public policy, economic savings are a far cry from the protections from injury contemplated under the police power. *See, e.g.*, *Medlin*, 199 N.C. at 85-86, 154 S.E. at 30-31. The societal benefits envisioned by the Map Act are not designed primarily to prevent injury or protect the health, safety, and welfare of the public. Furthermore, the provisions of the Map Act that allow landowners relief from the statutory scheme are inadequate to safeguard their constitutionally protected property rights.

A taking effectuated by eminent domain does not require "an actual occupation of the land," but "need only be a substantial interference with elemental rights growing out of the ownership of the property." *Long*, 306 N.C. at 198-99, 293 S.E.2d at 109 (citations omitted). These elemental rights are generally considered "an important feature of" the land and, as such, are accounted for within the valuation of the land. *See Town of Midland v. Wayne*, 368 N.C. 55, 66, 773 S.E.2d 301, 309 (2015) (stating that "development rights" are "an important feature of the condemned land and not a separate, compensable property right"); *Brown v. W.T. Weaver Power Co.*, 140 N.C. 333, 345, 52 S.E. 954, 958-59 (1905) ("The market value of property includes its value for any use to which it may be put." (citation omitted)); *see also Beroth II*, 367 N.C. at 343-44, 757 S.E.2d at 474-75 (majority opinion) (discussing various valuation methods).

Through inverse condemnation the owner may "recover to the extent of the diminution in his property's value" as measured by "the difference in the fair market value of the property immediately before and immediately after the taking." *Long*, 306 N.C. at 201, 293 S.E.2d at 110-11 (citations omitted); *see* N.C.G.S. § 136-112(1) (2015). "Obviously, not every act or happening injurious to the landowner, his property, or his use thereof is compensable." *Long*, 306 N.C. at 199, 293 S.E.2d at 109. Thus, to pursue a successful inverse condemnation claim, a plaintiff must demonstrate not only a substantial interference with certain property rights but also that the interference caused a decrease in the fair market value of his land as a whole.

By recording the corridor maps at issue here, which restricted plaintiffs' rights to improve, develop, and subdivide their property for an indefinite period of time, NCDOT effectuated a taking of fundamental property rights. On remand, the trier of fact must determine the value of the loss of these fundamental rights by calculating the value of the land before the corridor map was recorded and the value of the land afterward, taking into account all pertinent factors, including the restriction on each plaintiff's fundamental rights, as well as any effect of the reduced *ad valorem* taxes. *See, e.g.*, *Nantahala Power & Light Co. v. Moss*, 220 N.C. 200, 205-06, 17 S.E.2d 10, 13-14 (1941) (discussing principles involved in fair market valuation); *see also Beroth II*, 367 N.C. at 343-44, 757 S.E.2d at 474-75. Accordingly, the trial court improperly dismissed plaintiffs' inverse condemnation claim. Therefore, we affirm the decision of the Court of Appeals, which reversed the trial court's ruling to the contrary and remanded this case for further proceedings as described above.

AFFIRMED.