IN THE SUPREME COURT OF NORTH CAROLINA

No. 51PA19

Filed 1 May 2020

TED P. CHAPPELL AND SARAH CHAPPELL

v.

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION

Appeal pursuant to N.C.G.S. § 7A-27(b) from a final judgment entered on 3 July 2018 and an amended final judgment entered on 11 July 2018 by Mary Ann Tally, Superior Court Judge, Cumberland County. On 11 June 2019, pursuant to N.C.G.S. § 7A-31(a) and (b)(2), the Supreme Court granted defendant's petition for discretionary review prior to determination by the Court of Appeals. Heard in the Supreme Court on 9 December 2019.

*Yarborough, Winters & Neville, P.A., by Garris Neil Yarborough and H. Addison Winters; and Hendrick, Bryant, Nerhood, Sanders & Otis, LLP, by Matthew Bryant and T. Paul Hendrick, for plaintiff-appellees.*

*Cranfill, Sumner & Hartzog, by George B. Autry Jr., Stephanie Hutchins Autry, and Jeremy P. Hopkins, for amicus curiae Owners' Counsel of America.*

*Shiloh Daum and B. Joan Davis for amicus curiae North Carolina Advocates for Justice.*

*Joshua H. Stein, Attorney General by James M. Stanley, Alexandra Hightower, and William A. Smith, Assistant Attorneys General; Teague, Campbell Dennis & Gorham, by Jacob H. Wellman and Matthew W. Skidmore; and Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Steven Sartorio and William H. Moss, for the defendant-appellant.*

EARLS, Justice.

Ted and Sarah Chappell first moved to the Raeford Road property in Fayetteville that is at issue in this case in 1962, living there as tenants and raising their family. In 1985, they purchased a house on the property and approximately 2.92 acres of land. Two years later, the North Carolina General Assembly adopted the Roadway Corridor Official Map Act, Act of Aug. 7, 1987, ch. 747, sec. 19, 1987 N.C. Sess. Laws 1520, 1538–43, [hereinafter Map Act] (codified as amended N.C.G.S. §§ 136-44.50–44.54 (2017)). In 1992 and 2006, various portions of the Chappells' property were designated as within a roadway corridor pursuant to that statute. On 5 December 2014, the Chappells filed an inverse condemnation complaint against the North Carolina Department of Transportation (hereinafter NCDOT) seeking compensation for the taking of their property caused by NCDOT's recording of a Roadway Corridor Official Map that encompassed part of their property. Following a trial in 2018, a final judgment was issued awarding the Chappells $137,247 for the 1992 taking and $6,139 for the 2006 taking, both with pre-judgment interest at 8% compounded annually, along with reimbursement of property taxes paid, attorney's fees, costs, disbursements, expenses, and expert witness fees.

On direct appeal, pursuant to N.C.G.S. § 7A-27(b), prior to determination by the Court of Appeals, NCDOT raises four issues alleging error by the trial court. First, NCDOT contends the trial court erroneously characterized the nature of the taking in this case as the equivalent of a fee simple taking and therefore instructed

the jury to consider "the project in its completed state" as if the road already had been built when, in fact, the taking was much more limited in nature. According to NCDOT, this mischaracterization of the taking also led the trial court to make erroneous evidentiary rulings concerning what expert appraisal testimony would be excluded and what would be admitted.

Second, NCDOT argues that the trial court erred in adding the Chappells' discounted property taxes to the jury's award of just compensation, thus misinterpreting this Court's directive in *Kirby v. N.C. Dep't of Transp.*, 368 N.C. 847, 786 S.E.2d 919 (2016), that a trier of fact in these cases must determine the value of the loss, taking into account "any effect of the reduced *ad valorem* taxes." *Kirby,* 368 N.C. at 856, 786 S.E.2d at 926. The third issue raised by NCDOT is that the trial court erred in its use of an equity investment strategy to base its calculation of pre-judgment interest on the value of the taking. Finally, NCDOT contends that the trial court erred when it refused to allow NCDOT to exercise its statutory quick-take rights to take the entire property on the eve of trial. NCDOT asks us to vacate the trial court's judgment and remand for a new trial and additional post-judgment proceedings.

Addressing each of these issues, we first hold that as a threshold matter, there was no error in the trial court's exercise of its discretion to proceed to trial on the Chappells' inverse condemnation complaint notwithstanding NCDOT filing a motion for a permissive counterclaim to assert its quick-take rights on the eve of trial.

Second, we hold that any error in the trial court's characterization of the taking was harmless in light of the evidence in this case. Third, on the facts of this case, the trial court's treatment of the reduced property taxes was consistent with this Court's instruction in *Kirby*. Finally, we reverse the portion of the trial court's order concerning the proper evaluation of the pre-judgment interest rate because it was contrary to this Court's precedents, and we remand for further proceedings to apply a pre-judgement interest rate consistent with our prior cases.

## I.  Facts

The parties stipulated that the Chappells owned the property at issue along Raeford Road in Cumberland County, with no known encroachments adversely impacting the property prior to the takings at issue here. Between 1985 and 1992, the Chappells put a new roof on the home, remodeled the bathrooms, updated the wiring, and dug a well. On 29 October 1992, in furtherance of a project to build the Fayetteville Outer Loop, NCDOT recorded a Roadway Corridor Official Map pursuant to the Map Act with the Cumberland County Register of Deeds, which covered approximately .58 acres of plaintiffs' property. (Hereinafter the 1992 Map). Although this was only roughly twenty percent of the property's total land area, the 1992 Map showed the right of way line of the road going through the middle of the Chappells' house, a two-story, single-family home. On 6 June 2006, a second map was filed by defendant, expanding the area of plaintiffs' property covered by the corridor by an approximately 1.67 additional acres. (Hereinafter the 2006 Map).

Pursuant to the Map Act, property owners were prevented from developing or subdividing land within the protected corridor without approval from NCDOT. *See* N.C.G.S. §§ 136-44.51–44.53 (2017). *See also, Kirby,* 358 N.C. at 849–50, 786 S.E.2d at 921–22 (describing in detail the Map Act's restrictions, variances, and advance acquisition provisions). However, the Map Act did not permit NCDOT to physically enter or otherwise alter land or buildings in the proposed highway corridor. Landowners, including the Chappells, continued to have the right to use their property in any way that did not require a building permit or subdivision plat, and could sell or otherwise transfer rights to the property subject to the Map Act restrictions. They retained the right to lease or rent the property to others. The Chappells continued to live on their property until 2016.

The Chappells' expert appraiser testified at trial that the market value of their property in 1992, immediately before the Map Act taking, was $144,888, and the market value immediately after the taking was $7,641. In 2006, the market value of their property immediately before the second Map Act taking was $11,268, and the value immediately after the taking was $5,129. Thus, in his expert opinion, the damages suffered by the Chappells for the Map Act takings of their rights to develop their property were $137,247 in 1992 and $6,139 in 2006. Another real estate expert for the Chappells testified that there was no market for any of the properties in the 1992 corridor map area because there were plenty of alternative properties for sale in Cumberland County that were not encumbered, and prospective buyers would not

"want to buy something that does not work for the purpose that its designed." Similarly, there was no market for any real estate within the corridor map that was filed on 6 June 2006.

NCDOT did not present evidence for the jury in this case. The trial court granted the Chappells' motion in limine to exclude from evidence any expert opinion based on a variety of assumptions, such as assumptions about the duration of the Map Act restrictions or actions the Chappells could take to trigger condemnation of the property. Significantly, the trial court also excluded "[a]ny opinion on the value of the property based on the assumption that there is a market for the property in the corridor at fair market prices . . . " The trial court further excluded "any evidence concerning T.B. Harris, Jr. & Associates' after value appraisal of the Plaintiffs' property," and denied NCDOT the ability to cross-examine the Chappells' appraiser "as to the value of continued use, possession, [and] control of the value of the property." Having concluded that NCDOT's expert appraisers failed to comply with the definition of damages as set out in *Kirby* and further failed to meet the test for expert testimony under Rule 702 of the North Carolina Rules of Evidence, the trial court excluded any testimony from NCDOT's proposed expert witnesses.

Following the jury's verdict as to the amount of just compensation that the Chappells are entitled to recover for NCDOT's Map Act takings on 29 October 1992 and 6 June 2006, the trial court issued a final judgment addressing three additional issues. The trial court awarded the Chappells their attorneys' fees, costs,

disbursements, expenses, and expert witnesses fees; required NCDOT to pay all of the ad valorem taxes actually paid by the Chappells from 2002 to 2016, the years for which evidence was presented as to the taxes they paid on their property; and awarded pre-judgment interest on the values of the two takings at the compounded rate of 8% per annum.

## II.    NCDOT's Quick-Take Rights

We first address the ruling, made by the trial court prior to trial, denying NCDOT the right to exercise its statutory quick-take rights under N.C.G.S. § 136-104 (2019) to take title immediately to the entire property.  The Chappells filed this inverse condemnation action raising constitutional claims and a declaratory judgment claim on 5 December 2014.  NCDOT answered the complaint on 6 February 2015, denying that a taking had occurred and seeking dismissal of the action on several grounds. Asserting a total of eighteen defenses, NCDOT alleged that the Chappells lacked standing, that the court lacked jurisdiction, that the claims were not ripe, that administrative remedies had not been exhausted, that damages were not mitigated, and that plaintiffs' claims were barred by estoppel. On 9 October 2015, the trial court stayed the case, on motion by the Chappells, pending this Court's ruling in *Kirby,* which was subsequently decided on 10 June 2016.  It was not until 1 February 2018, as the parties and the trial court were preparing to go to trial on the Chappells' claims, that NCDOT sought to acquire full rights to the Chappells' property through a quick-take action asserted as a permissive counterclaim.  The

trial court ruled, at a hearing in open court on 1 February 2018, that NCDOT could file a condemnation action as a permissive counterclaim in the present action, but because the case was already calendared to go to trial on 9 April 2018, a quick-take complaint that immediately transfers title to the property would not be permitted.

The appropriate standard of review here is abuse of discretion because the General Assembly has granted trial courts broad discretion to conduct condemnation proceedings in the manner that will best achieve the purposes of the statute. Recognizing the uniqueness of the quick-take procedure, the statute provides that:

> [i]n all cases of procedure under this Article where the mode or manner of conducting the action is not expressly provided for in this Article or by the statute governing civil procedure or where said civil procedure statutes are inapplicable the judge before whom such proceeding may be pending shall have the power to make all the necessary orders and rules of procedure necessary to carry into effect the object and intent of this Chapter and the practice in such cases shall conform as near as may be to the practice in other civil actions in said courts.

N.C.G.S. § 136-114 (2019). The procedure to follow when the NCDOT seeks to acquire fee simple rights to property within a Map Act corridor that is already the subject of a pending inverse condemnation action is not specified in Chapter 136. Therefore, the trial court needed to make all the necessary orders and rules to carry out the purpose of the statute. *Id.*, *see also, Vaughan v. Mashburn,* 371 N.C. 428, 433, 817 S.E.2d 370, 374 (2018) (denial of a motion to amend a pleading is reviewed for abuse of discretion). In general, an "[a]buse of discretion results where the court's ruling is

manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis,* 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988) (citing *State v. Parker,* 315 N.C. 249, 337 S.E.2d 497 (1985)). Thus, the question here is whether the trial court's ruling was unsupported by reason or manifestly arbitrary. We have previously held that delay in seeking to amend a pleading, and particularly where it causes prejudice to a party, can justify a decision to deny the amendment. *See News & Observer Pub. Co. v. Poole,* 330 N.C. 465, 485, 412 S.E.2d 7, 19 (1992) ("Among proper reasons for denying a motion to amend are undue delay by the moving party and unfair prejudice to the non-moving party.")

NCDOT argues that the trial court's decision to deny it the right immediately to obtain title to the Chappells' property once NCDOT complied with the provisions of N.C.G.S. §§ 136-103, -104 (2019), by identifying the property being taken, estimating just compensation, and depositing that amount in court, was an abuse of discretion because the statute mandates that in those circumstances the title transfers immediately to NCDOT, and the trial court has no discretion to deny possession to the department. Under the plain language of the statute, NCDOT contends, the trial court had no authority to deny title and to rule otherwise would allow a single property owner to "stop a highway project in its tracks by simply declining to resolve his or her Map Act claim."

To be clear, the trial court's 1 February 2018 ruling in open court, later entered by written order dated 16 February 2018, did not deny NCDOT the right to assert a

permissive counterclaim under any and all circumstances. Indeed, the trial court stated that "a counterclaim in an inverse condemnation case is the appropriate manner by which the Department of Transportation may seek to acquire additional rights in the property subject to the ongoing, prior litigation." What the trial court denied was the right to assert the counterclaim as presented because, as drafted, it appeared to be an "attempt to convert this inverse condemnation action into a direct condemnation action." Thus, the issue here is the proper procedure in this particular case, not the denial of NCDOT's statutory right to obtain title to the property and ultimately, to build the Fayetteville Outer Loop. Because Chapter 136 of the North Carolina General Statutes provides no manner or mode for conducting a quick-claim direct condemnation action during a pending inverse condemnation action, the judge before whom the inverse condemnation action is pending is in the best position to determine how the matter should proceed.

Here, the trial court's order was based on the length of time the inverse condemnation proceeding had been pending, the procedure the court followed in a prior similar case, and its review of the specific language of the proposed permissive counterclaim. From the record in this case, it appears the trial court was concerned to prevent the derailment, immediately before trial, of the Chappells' efforts to obtain just compensation for the takings they experienced in 1992 and 2006. The trial court did not abuse its discretion, granted by N.C.G.S. § 136-114, in ruling that any permissive counterclaim filed by NCDOT in this case could not be interposed at the

last minute to prevent a trial on the Chappells' inverse condemnation claim. On remand, NCDOT can assert its quick-take action, and the fair market value of the Chappells' remaining property interest as of the date of the final judgment has been established by the jury's verdict here.

## III. The Nature of the Taking

### A. Standard of Review

A trial court's conclusions of law are reviewed *de novo,* including legal conclusions contained in jury instructions. *See Beroth Oil Co. v. N.C. Dep't of Transp.,* 367 N.C. 333, 338, 757 S.E.2d 466, 471 (2014); *see also Akzona, Inc. v. Southern Ry. Co.,* 314 N.C. 488, 494, 344 S.E.2d 759, 763 (1985) (reversing trial court for improper jury instructions on inverse condemnation and remanding for new trial). Generally, a trial court's rulings about whether to admit or exclude expert testimony are reviewed for abuse of discretion. *N.C. Dep't of Transp. v. Mission Battleground Park, DST,* 370 N.C. 477, 480, 810 S.E.2d 217, 220 (2018). Among other ways, an abuse of discretion may occur when the trial court misapprehends the applicable law. *See, e.g., In re Estate of Skinner,* 370 N.C. 126, 139–40, 404 S.E.2d 449, 457–58 (2017).

To set aside a verdict, any errors made by the trial court must also be shown to be prejudicial. Rule 61 of the North Carolina Rules of Civil Procedure provides that:

> No error in either the admission or exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by any of the parties is ground for granting

> a new trial or for setting aside a verdict or for vacating,
> modifying, or otherwise disturbing a judgment or order,
> unless refusal to take such action amounts to the denial of
> a substantial right.

N.C.G.S. § 1A-1, Rule 61. In the context of legally erroneous jury instructions, "it must be shown that 'a different result would have likely ensued had the error not occurred.'" *Word v. Jones ex rel. Moore,* 350 N.C. 557, 565, 516 S.E.2d 144, 148 (1999) (quoting *Responsible Citizens in Opposition to the Flood Plain Ordinance v. City of Asheville,* 308 N.C. 255, 271, 302 S.E.2d 204, 214 (1983)) (granting a new trial where the Court was unable to say as a matter of law that plaintiff was not prejudiced by erroneous jury instruction on defense of sudden incapacitation); *see also, N.C. State Highway Comm'n v. Gasperson,* 268 N.C. 453, 456, 150 S.E.2d 860, 863 (1966) (reversing jury verdict and remanding for new trial to determine just compensation for highway easement where "the challenged instruction was erroneous and prejudicial.").

*B. Valuing an Indefinite Negative Easement*

NCDOT argues that the trial court fundamentally mischaracterized the nature of the taking when NCDOT recorded a corridor map under the Map Act that encompassed the Chappells' property. The trial court found that the nature of the taking was a negative easement that never expired and specified that the only permissible proof of damages was a calculation of the difference between the value of the Chappells' property before the corridor maps were recorded and the value of the

property after recordation. NCDOT contends that the Chappells were allowed to argue that the taking was a fee simple taking; that the trial court improperly precluded the introduction of any evidence to the contrary, including evidence of the Chappells' continued use and enjoyment of the property; that the jury was improperly precluded from hearing that the Chappells could be relieved from the Map Act's restrictions after three years; and that the jury was erroneously instructed that "in arriving at the fair market value of the property subject to the Defendant's restrictions on its use immediately after the taking, you should contemplate the project in its completed state and any damage to the remainder due to the use to which the part appropriated may, or probably will, be put."

Instead, NCDOT sought to introduce evidence of the value of the negative easement that restricted the Chappells' right to improve, develop or subdivide their property for three years, through the expert opinion of an appraiser who calculated that value to be $425 for the 1992 restrictions and $12,000 for the 2006 restrictions. After the trial court ruled that NCDOT's appraiser could not render an opinion based on the three-year period established by the statute,[1] the appraiser revised his calculations and concluded that the value of the 1992 restrictions was $1,250 and

---

[1] The Map Act provided that a property owner could seek relief from the Act's restrictions by submitting an application for a building permit or subdivision plat, which triggered a three-year period during which NCDOT would have to either approve the application or move to acquire the property in fee simple. *See* N.C.G.S. §136-44.51(b) (2017). If the department took no action within the three-year period, the restrictions ended and the property could be treated as unencumbered. *Id.*

$21,050 for the 2006 restrictions. NCDOT's appraiser did not seek to calculate the fair market value of the property before and after the Map Act corridor maps were recorded and had no opinion on the difference in market value. The question NCDOT asks is whether the trial court's alleged mischaracterization of the nature of the taking led the court to erroneously exclude its appraiser's testimony, improperly allow the Chappells' appraiser to testify, and erroneously instruct the jury.

Our answer is that what matters is whether the trial court correctly applied the law concerning how just compensation is measured, not the label given by the trial court or the parties to the taking that occurred. The nature of the taking impacts the fair market value of the property before and after the taking, but the touchstone is fair market value of the property. The trial court's evidentiary rulings concerning the expert testimony here were not an abuse of discretion because they were based on a correct understanding of the proper measure of just compensation.[2]

The General Assembly has specified how damages are to be measured in inverse condemnation proceedings in these circumstances.

> Where only a part of a tract is taken, the measure of damages for said taking shall be the difference between the fair market value of the entire tract immediately prior to said taking and the fair market value of the remainder immediately after said taking, with consideration being given to any special or general benefits resulting from the

---

[2] A trial court's ruling on the admissibility of expert testimony will not be reversed on appeal absent a showing of abuse of discretion, even when the exclusion of expert testimony determines the outcome of the case. *State v. McGrady,* 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016) (citing *GE v. Joiner,* 522 U.S. 136, 142-43, 118 S. Ct. 512, 517 (1997)).

utilization of the part taken for highway purposes.

N.C.G.S. § 136-112(1) (2019).[3] *See also, N.C. Highway Comm'n v. Hettiger,* 271 N.C. 152, 156, 155 S.E.2d 469, 472 (1967) (identifying that this statute prescribes the rule for determining what constitutes just compensation); *Gallimore v. Highway Comm'n,* 241 N.C. 350, 353, 85 S.E.2d 392, 395 (1955) (holding that just compensation is the fair market value of the property before and after the taking of a portion for highway purposes).

*Kirby* holds that a Map Act recordation effected an "indefinite restraint on fundamental property rights" which restricts the property owners' rights to improve, develop, and subdivide their property for an indefinite period of time. 368 N.C. at 855–56, 786 S.E.2d at 925–26. The value of the loss of those rights is to be measured "by calculating the value of the land before the corridor map was recorded and the value of the land afterward, taking into account all pertinent factors, including the restriction on each plaintiff's fundamental rights, as well as any effect of the reduced *ad valorem* taxes." *Kirby*, 368 N.C. at 856, 786 S.E.2d at 926 (citing *Natahala Power & Light Co. v. Moss*, 220 N.C. 200, 205–06, 17 S.E.2d 10, 13–4 (1941) and *Beroth,* 367 N.C. at 343–44, 757 S.E.2d at 474–75.). Thus, the relevant determination when

---

[3] The General Assembly enacted N.C.G.S. § 136-112 as a part of Section 2, Chapter 1025, of the Session Laws of 1959. 1959 N.C. Sess. Laws 1046, 1051. The rule, as to the measure of damages stated there, "is in accord with that adopted and stated by this Court in numerous decisions prior to the adoption of the 1959 Act." *N.C. State Highway Comm'n v. Gasperson*, 268 N.C. 453, 455, 150 S.E.2d 860, 862 (1966) (citing *Robinson v. Highway Comm'n,* 249 N.C. 120, 105 S.E. 2d 287 (1958)).

calculating just compensation for a taking that involves less than the entire parcel of property starts with the fair market value of the entire property before the taking and the fair market value of what remains after the taking. This is true whether the taking is an indefinite negative easement, as in the case of Map Act takings, or involves some other taking for public use. By eminent domain, the state may take "an easement, a mere limited use, leaving the owner with the right to use in any manner he may desire so long as such use does not interfere with the use by the sovereign for the purpose for which it takes, or it may take an absolute, unqualified fee, terminating all of defendant's property rights in the land taken." *Morganton v. Hutton & Bourbonnais Co.*, 251 N.C. 531, 533, 112 S.E.2d 111, 113 (1960) (citations omitted). The property owner's damages are calculated on the basis of before and after fair market values in each instance.

While it speaks to the exclusive measure of damages, the statute does not restrict expert real estate appraisers with regard to the method they use to determine fair market value. *Bd. of Transp. v. Jones,* 297 N.C. 436, 438, 255 S.E.2d 185, 187 (1979). "Methods of appraisal acceptable in determining fair market value include: (1) comparable sales, (2) capitalization of income, and (3) cost. While the comparable sales method is the preferred approach, the next best method is capitalization of income when no comparable sales data are available." *Dep't of Transp. v. M.M. Fowler, Inc.,* 361 N.C. 1, 13 n.5, 637 S.E.2d 885, 894 n.5 (2006) (citing 5 Julius L. Sackman et al., *Nichols on Eminent Domain* § 19.01, 19-2 (rev. 3d ed. 2006) and 4

Julius L. Sackman et al., *Nichols on Eminent Domain* § 12B.08, 12B-47 to -48 (rev. 3d ed. 2006)); *see also, Templeton v. State Highway Comm'n*, 254 N.C. 337, 339, 118 S.E.2d 918, 920 (1961) (allowing the admission of "[a]ny evidence which aids . . . in fixing a fair market value of the land and its diminution by the burden put upon it").

NCDOT was entitled to present evidence of the before and after fair market value of the Chappells' property using acceptable methods of appraisal, but only methods using factors that legally can be considered. In *Dep't of Transp  v. M.M. Fowler, Inc.,* the Court reversed and remanded for a new trial because the property owner's appraiser based their fair market value of the property solely on the capitalized alleged lost business profits, which we held was not admissible evidence because the lost business profit from a business conducted on the property is not a compensable loss. *M.M. Fowler, Inc.*, 361 N.C. at 15, 637 S.E.2d at 895. In that case, we explained:

> During a proceeding to determine just compensation in a partial taking, the trial court should admit any relevant evidence that will assist the jury in calculating the fair market value of property and the diminution in value caused by condemnation. *Abernathy v. S. & W. Ry. Co.,* [ ]150 N.C. 97, 108–09, 63 S.E. 180, 185 (1908). Admission of evidence that does not help the jury calculate the fair market value of the land or diminution in its value may "confuse the minds of the jury, and should be excluded." *Id.* [ ] at 109, 63 S.E. at 185. In particular, specific evidence of a landowner's noncompensable losses following condemnation is inadmissible. *Templeton v. State Highway Comm'n*, 254 N.C. 337, 339–40, 118 S.E.2d 918, 920–21 (1961) (finding trial court erred in admitting evidence of the cost of silt and mud removal because "it [was] possible

> that the jury could have gotten the impression that the removal . . . was compensable as a separate item of damage").

*M.M. Fowler, Inc.*, 361 N.C. at 6–7, 637 S.E.2d at 890 (third and fourth alteration in original). Therefore, an opinion concerning a property's fair market value is inadmissible if it materially relies on factors that legally cannot be considered. Moreover, an expert's opinion must be reasonably reliable to be admissible. *See Dep't of Transp. v. Haywood Cty.,* 360 N.C. 349, 352–53, 626 S.E.2d 645, 647 (2006) (trial court properly excluded appraisers' expert testimony because it "lacked sufficient reliability").

Applying these principles to this case, the trial court did not abuse its discretion to rule that NCDOT's expert appraiser's opinion, to the extent that the expert sought to value the rights that remained to the property owner after the taking based on a three-year temporary negative easement, was not admissible. That testimony assumed a three-year negative easement when this Court previously held that a Map Act recording creates an "indefinite restraint on fundamental property rights." *Kirby,* 368 N.C. at 855–56, 786 S.E.2d at 925-26. *Cf. North Carolina State Highway v. Black,* 239 N.C. 198, 205, 79 S.E.2d 778, 784 (1954) (compensation for a perpetual easement cannot be based on an assumption that it will be abandoned).

NCDOT's expert appraiser testified at the motions hearing that lacking any comparable sales and assuming an indefinite negative easement, he based a subsequent valuation of the property on floodplain property values because in his

view the restrictions imposed by a Map Act recordation are similar to the restrictions on properties in a floodplain. The trial court ultimately ruled that the floodplain analogy was not a proper basis for determining the fair market value of the property after the Map Act taking. The trial court's ruling was based on the fact that the floodplain property used in the appraisal was in and around Mecklenburg County, "not anywhere near Cumberland County," and that the floodplain designation is an exercise of police power, unlike the Map Act taking which is an exercise of eminent domain. The court's decision here to exclude the testimony as unreliable and potentially misleading to the jury because "there is no reliable reason to choose flood plain property as the analogous property" was not an abuse of discretion. *See, e.g., Gallimore v. State Highway & Pub. Works Com.,* 241 N.C. 350 354, 85 S.E.2d 392, 396 (1955) ("Any evidence which aids the jury in fixing a fair market value of the land, and its diminution by the burden put upon it, is relevant and should be heard; any evidence which does not measure up to this standard is calculated to confuse the minds of the jury, and should be excluded.").

Lacking any sales of comparable property from which to determine fair market value, there remained two other methods of assessing the fair market value of the property, the cost approach and the income capitalization approach. *M.M. Fowler, Inc.,* 361 N.C. at 13 n.5, 637 S.E.2d at 894 n.5. Some of the evidence that NCDOT sought to introduce concerning the value of the property after the Map Act recordings, such as the fact that the Chappells continued to live in the home until 2016, might

have been admissible if the income capitalization approach to the value of the home had been employed by NCDOT's appraisers.[4] However, there was no evidence from a NCDOT appraiser concerning the fair market value of the property after the 1992 and 2006 takings based on a cost approach or income capitalization approach to valuation. Thus, it was not an abuse of discretion for the trial court to exclude testimony that did not relate to one of the three appropriate methods of determining fair market value.

Citing *Duke Power Co. v. Rogers*, 271 N.C. 318, 320, 156 S.E.2d 244, 247 (1967) and other precedent establishing that it is error to instruct the jury to award damages based on a fee simple taking where the condemning authority takes a lesser interest in the property, NCDOT further argues that it was error for the trial court to admit the testimony of the Chappells' appraiser. NCDOT contends that testimony improperly assumed that the highway was present on the property immediately after the filing of the corridor map, and it valued the property rights inside the corridor at zero despite the fact that the Chappells retained some rights to use the property after the takings. However, here there was ample evidence in the record, including the *voir dire* testimony of NCDOT's own appraisers, that there was no market for the Chappells' property once the 1992 corridor map was recorded. Whether one assumes the road is built, calls the taking similar to a fee simple taking, or gives the taking

---

[4] The fact that the Chappells lived in the property arguably could be relevant to the habitability of the premises and its rental value.

some other name, the fact that there was evidence of no market whatsoever for the property, in other words, that no one wanted to buy a house in the Outer Loop corridor once the 1992 map was recorded, was a proper consideration in determining the after-taking fair market value.

It is certainly correct that Rule 702 of the North Carolina Rules of Evidence applies here. *See N.C. Dep't of Transp. v. Mission Battleground Park, DST,* 370 N.C. 477, 485, 810 S.E.2d 217, 223 (2018) (directing on remand, with regard to a licensed real estate broker, "the superior court should decide in the first instance whether his testimony about fair market value is admissible under Rule 702."). However, we only overturn the trial court's ruling on whether to admit or exclude expert testimony where there has been an abuse of discretion. *State v. McGrady*, 368 N.C. at 893, 787 S.E.2d at 11 ("The standard of review remains the same whether the trial court has admitted or excluded the testimony …"). In this case it was not an abuse of discretion for the trial court to allow the Chappells' appraiser to testify concerning the fair market value of their property after the taking because that expert opinion was based on evidence that there was, in fact, no market whatsoever for the property.

With regard to the jury instructions, NCDOT argues the trial court erred in twice instructing that the jury should "contemplate the project in its completed state and any damage to the remainder due to the use to which the part appropriated may, or probably will, be put." The trial court based this instruction on the language of *Dep't of Transp. v. Bragg,* 308 N.C. 367, 370, 302 S.E.2d 227, 229 (1983), cited in the

footnote to the pattern jury instruction. Again citing *Rogers,* NCDOT contends that it was reversible error to instruct the jury to award damages based on a fee simple taking where a lesser taking occurred. *See Rogers,* 271 N.C. at 320, 156 S.E.2d at 247.

*Bragg* involved the taking of a portion of the landowners' property for the purpose of widening a road pursuant to N.C.G.S. § 136-104, immediately vesting title with NCDOT. In the process of widening the road, a new drainage pattern caused additional damage to the remaining property, and the issue was whether evidence of this damage caused by the water diversion could be considered by the jury in assessing just compensation. *Bragg,* 308 N.C. at 370, 302 S.E.2d at 229. In those circumstances, it was appropriate for the jury to consider as an element of just compensation any evidence of damage to the landowners' remaining property.[5]

In contrast, under the Map Act, the indefinite negative easement created by recording a corridor map does not by itself result in the building or widening of a road. While it may have been erroneous to include this jury instruction given the facts of this case, to the extent that the taking here was a negative easement and not similar to a fee simple taking of the property, the error was not prejudicial because it could

---

[5] Indeed, the Court in *Bragg* concluded that the jury should consider the project as though completed in arriving at just compensation because "when, as here, the Department has initiated a partial taking under N.C.G.S. § 136-103 and trial on the issue of damages has not yet occurred, principles of judicial economy dictate that the owners of the taken land may allege a further taking by inverse condemnation in the ongoing proceedings." *Bragg,* 308 N.C. at 370 n.1, 302 S.E.2d at 230 n.1. Under a Map Act recording, title has not transferred, a road is not built, and drainage damages have not occurred.

not have impacted the jury's determination of just compensation. The only evidence of the fair market value of the Chappells' property before and after the 1992 and 2006 takings was the evidence provided by the Chappells' appraiser. There was no evidence of an alternative fair market valuation on a cost basis or income capitalization basis that could have informed the jury's verdict. Therefore, regardless of the trial court's instruction regarding the road being built, the evidence admitted at trial supported the jury's verdict on fair compensation. The error, if any, would not have impacted the result in this particular trial.

## IV.   Property Taxes

The Map Act initially reduced tax rates for impacted unimproved properties, and in 2011, the General Assembly further provided that designated properties in protected corridors would be assessed lower property taxes, being taxed at 20% of appraised value for unimproved property and 50% of the appraised value for improved property. *See* An Act to Reduce the Property Tax Owed For Improved Property Inside Certain Roadway Corridors, S.L. 2011-30, 2011 N.C. Sess. Laws 42 (codified at N.C.G.S.. §§ 105-277.9, -277.9A (2019)). In *Kirby,* this Court directed that the trier of fact should determine the value of the property after the corridor map was recorded, "taking into account . . . any effect of the reduced *ad valorem* taxes." *Kirby,* 368 N.C. at 849, 786 S.E.2d at 921. The trial court interpreted this to mean that the Chappells should be compensated for the actual *ad valorum* taxes they paid following the taking, while NCDOT contends that the amount of just compensation should be

offset by the reduced property taxes because the reduction in taxes was intended to be partial compensation for the taking. NCDOT further argues that owners can only be reimbursed their property taxes when there is a fee simple taking. *See* N.C.G.S.§ 136-121.1 (2019).

However, in this case, where the evidence was that the property essentially had no fair market value once the 1992 corridor map was recorded, and there was no other evidence of the fair market value of the property assessed using a cost approach or an income capitalization approach, the Chappells were effectively paying taxes on property that had no value. Thus, it was appropriate, following *Kirby,* for the trial court to take into account the effect of the reduced *ad valorem* taxes in the way that it did, and compensate the Chappells for the actual taxes they paid at a time when their property had virtually no fair market value.

## V.    Pre-Judgment Interest

Plaintiffs in inverse condemnation proceedings may seek interest on the judgment awarded by a jury as damages "at the legal rate on said amount from the date of the taking to the date of the judgment." N.C.G.S.. § 136-113 (2015). At the time this action was filed, the legal rate of interest for the purposes of this statute was set by N.C.G.S. § 24-1 (2015) at 8% per annum.[6] The landowner may rebut this

---

[6] N.C.G.S. § 136-113 was amended in 2016 to tie the legal rate of interest in condemnation proceedings to the prime lending rate instead of the 8% set in N.C.G.S. § 24-1. However, because that amendment post-dated the filing of this action, it does not apply here.

presumptively reasonable rate through the introduction of evidence of prevailing market interest rates. *Lea Co. v. N.C. Bd. of Transp.,* 317 N.C. 254, 261 345 S.E.2d 355, 359 (1986). The amount of additional compensation for a delay in payment in inverse condemnation actions is the "prudent investor" standard, defined as the rate which would have been earned by "a reasonably prudent person investing funds so as to produce a reasonable return while maintaining safety of principal." *Lea,* 317 N.C. at 262, 345 S.E.2d at 360 (citations omitted). Even more specifically, the *Lea* Court assumed that a prudent investor would typically diversify her portfolio, and therefore the trial court must "consider prevailing rates, during the period of delay, for investments of varying lengths and risk," and such investments typically include "short, medium, and long-term government and corporate obligations." *Id.,* 317 N.C. at 263, 345 S.E.2d at 360 (citations omitted). In addition, *Lea* held that "[s]ince this Court had now adopted the 'prudent investor' standard, compound interest should be allowed for delayed payment in condemnation cases if the evidence shows that during the pertinent period the 'prudent investor' could have obtained compound interest in the market place." *Id.,* 317 N.C. at 264, 345 S.E.2d at 361.

In this case, the parties stipulated that 8% simple interest is presumptively reasonable and that it was proper for the trial court to rule on the issue of interest. The trial court heard testimony from experts in finance and economics offered by both parties and based on that evidence, made relevant findings of fact and conclusions of law. Specifically, the trial court found that compound rates of return were available

to the Chappells from 1992 to the date of the judgment, and that a compound rate of return of 8% per annum would put the Chappells in as good a position as they would have been if NCDOT had not taken their property.

The Chappells' economist, found to be credible by the trial court, testified that a 60% stock/40% bond portfolio mix "would satisfy the prudent investor goal of providing a reasonable return while maintaining the safety of principal." Based on that mix, his testimony was that the compound rate of return from the date of the 1992 taking to the present was 8.52%, and the compound rate of return from the date of the 2006 taking to the present would be 7.5%. The trial court concluded that it was appropriate to apply a compounded interest rate of 8% per annum to the value of both the 1992 and 2006 takings from the date of each taking to the entry of final judgment.

The problem with the trial court's analysis is that if the 8% interest is based on the legal rate of 8% per annum simple interest set by N.C.G.S. § 24-1, deemed presumptively reasonable and stipulated by the parties, then it was error to compound that rate because under *Lea*, a plaintiff can choose a) the statutory rate, or, b) rebut it with a prudent investor rate compounded if compounded rates would have been available, but cannot combine both methods of arriving at the appropriate interest calculation. *See, Lea,* 317 N.C. at 261, 345 S.E.2d at 359.

Alternatively, as seems more likely, if the trial court's compounded interest rate of 8% per annum was based on the "prudent investor" standard, then the expert testimony in this case failed to limit the type of alternative investments to interest-

bearing instruments but rather assumed a portfolio of 60% equity/40% bond mix. *Lea* referenced an "interest" portfolio and "government and corporate obligations." Reading *Lea* in conjunction with this Court's opinion in *Fidelity Bank v. N.C. Dept. of Revenue,* 370 N.C. 10, 20, 803 S.E.2d 142, 150 (2017), which was not an inverse condemnation case but did hold that the term "interest" when undefined in a statute is unambiguous and means "periodic payments received by the holder of a bond," the interest rate available under the "prudent investor" standard for determining the appropriate interest rate to apply to a judgment in an inverse condemnation case must be a rate produced by debt instruments or debt obligations, such as commercial bonds or treasury bills during the relevant time period.

Therefore, the trial court erred in applying a compounded interest rate of 8% per annum based on a prudent investor's investment portfolio that included equity investments. In the absence of evidence in the record concerning what rates of return a prudent investor might have obtained from a diversified portfolio of commercial bonds and/or treasury bills, and our own inability to make factual findings, we remand to the trial court for further proceedings to determine the appropriate interest rate to apply consistent with this opinion.

## VI.    Conclusion

*Kirby v. N.C. Dep't of Transp.* established that by recording corridor maps, the NCDOT took significant and fundamental property rights from the property owners in the affected corridors. The evidence in this case showed that for the Chappells, the

fair market value of their property plummeted after the 1992 map was recorded because no one was interested in buying a house in Cumberland County that might eventually be condemned to make way for the Fayetteville Outer Loop. The trial court correctly applied the statutorily defined measure of damages for a partial taking and made evidentiary rulings consistent with what is relevant to determining fair market value. Any error in the jury instructions was harmless in light of the evidence in this case. The trial court did not err in taking into account the taxes the Chappells paid on property that had virtually no value and correctly compensated them for the actual amounts they demonstrated they paid. On remand, all parties can provide supplemental evidence to the trial court concerning the appropriate compounded interest rate to apply under the "prudent investor" standard, properly understood.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.